UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHAMARIAN AUSTIN, as dependent administrator of, and on behalf of, ILIANA CLAIRE HEJLIK, J.S. #1, J.S. #2, J.S. #3, DONNA THOMAS, and CLIFF BENJAMIN MITCHELL, individually, the ESTATE OF JAMAL ALI SHAW, and JAMAL ALI SHAW's heirs-at-law; and DONNA THOMAS, individually, | § § § § § § § § | |
| | § | CIVIL ACTION NO. _____ |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| CITY OF PASADENA, TEXAS; MARTIN E. AGUIRRE; JOANNA S. MARROQUIN; DARLENE MCCAIN a/k/a RITA M. MCCAIN; and RYAN W. WHITEHEAD, | § § § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **Jamal Shaw, arrested only for alleged public intoxication, experienced horrific pain and death. Jamal had a seizure in his cell, clearly visible to inmates and Pasadena officers. Instead of treating Jamal, Defendants tased him, assaulted him, handcuffed him, and strapped him into a restraint chair. Jamal suffered and died as a result.**




<u>Table of Contents</u>

I.    Introductory Allegations ............................................................................... 4

    A.    Parties .................................................................................................. 4

    B.    Jurisdiction and Venue ........................................................................ 7

II.   Factual Allegations ...................................................................................... 8

    A.    Introduction ......................................................................................... 8

    B.    Jamal's Death ...................................................................................... 9

        1.    Introduction ................................................................................ 9

        2.    Prior Arrests and Incarceration by Pasadena Police Department ........ 9

        3.    Jamal's March 28, 2019 Arrest and Incarceration, and March 29, 2019 Death ............................................................................... 13

            a.    Arrest and Transport to Jail ............................................. 13

            b.    Defendants' Assault of Jamal During His Seizure ................. 14

            c.    Taser Download .............................................................. 20

        4.    Witnesses ................................................................................. 22

            a.    Aguirre, M.E. – Day Shift Patrol Division ........................... 22

            b.    Alonso, Bryan - Inmate .................................................... 22

            c.    Ayala, Reynaldo - Inmate ................................................. 23

            d.    Barboza, Jessica - PSO ..................................................... 23

            e.    Byerly, David – EMT ....................................................... 24

            f.    Ford, Kelli - EMT ........................................................... 25

            g.    Guerrero, Juan – Inmate ................................................... 26

            h.    Loya, Santiago - Inmate .................................................... 26

            i.    McCain, Darlene – Day Shift PSO Supervisor ...................... 27

            j.    Marroquin, Joanna – Day Shift PSO .................................. 27

            k.    Morales, Juan Rodriguez – Inmate ..................................... 29

            l.    Rivera, Jason Andrew – Inmate .......................................... 30

            m.    Whitehead, Ryan – Day Shift PSO ..................................... 30

        5.    Medical Records/Death Reports ................................................. 31

            a.    EMT Medical Records ...................................................... 31

            b    Hospital Records .............................................................. 31

            c    Autopsy – Harris County Institute of Forensic Sciences ......... 32

    C.    Individual Defendants' Knowledge and Education .......................... 33

      D.    *Monell* Liability of City of Pasadena ................................................ 34

          1.    Introduction ................................................................................ 34

          2.    City of Pasadena Policies, Practices, and/or Customs ........................ 35

          3.    Other Incidents .......................................................................... 44

III.   Causes of Action ........................................................................................... 47

      A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ................................... 47

      B.    Remedies and Damages for Violation of Constitutional Rights and/or Other Federal Claims ......................................................................... 48

      C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ............................................. 49

      D.    Cause of Action Against City of Pasadena Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................................. 52

      E.    Cause of Action Against City of Pasadena For Violation of Americans With Disabilities Act and Rehabilitation Act ................................... 54

IV.   Concluding Allegations and Prayer ............................................................. 57

      A.    Conditions Precedent ......................................................................... 57

      B.    Use of Documents at Trial or Pretrial Proceedings ......................... 57

      C.    Jury Demand ...................................................................................... 57

      D.    Prayer ................................................................................................. 57

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Shamarian Austin ("Ms. Austin") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Shamarian Austin was Jamal Ali Shaw's sister.  Decedent Jamal Ali Shaw is referred to herein at times as "Mr. Shaw" or "Jamal."  Shamarian Austin sues as the Dependent Administrator of the Estate of Jamal Ali Shaw, Deceased.  Shamarian Austin, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate and all of Jamal's heirs  (including Jamal's heirs-at-law, including Iliana Claire Hejlik (Jamal's wife); J.S. #1 (Jamal's minor daughter); J.S. #2 (Jamal's minor daughter), and J.S. #3 (Jamal's minor daughter)). All people referenced in the immediately preceding sentence, other than Shamarian Austin, are collectively referred to herein as the "Claimant Heirs."  Shamarian Austin asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, Donna Thomas (Jamal's mother), Cliff Benjamin Mitchell (Jamal's father), and Claimant Heirs.  When this complaint includes allegations that Shamarian Austin is seeking damages individually, it is asserting that Shamarian Austin is seeking a judgment for damages for all persons for whom she is legally able to pursue damages related to events occurring in this case, and it is not asserting that she, as a sibling of Jamal, is entitled to damages for herself individually as a result of the assault and death of Jamal.  Shamarian Austin qualified as the estate administrator in or about January 2021, in a case with Cause Number 483143, in the Probate Court No. 3 of Harris County, Texas, styled *Estate of Jamal Ali Shaw, Deceased*.

2.      Plaintiff Donna Thomas ("Ms. Thomas") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Ms. Thomas was Jamal Ali Shaw's mother. Ms. Thomas sues in her individual capacity and seeks all wrongful death damages available to her.

3.      Defendant City of Pasadena, Texas ("Pasadena" or "City of Pasadena") is a Texas incorporated municipality/city. Pasadena may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer. The identity of Pasadena's chief executive officer is determined by Pasadena's decision to use the mayor-council form of government. As a result, Pasadena's chief executive officer is Mayor Jeff Wagner. Mayor Jeff Wagner may be served with process at Pasadena City Hall, 1149 Ellsworth Drive, Pasadena, Texas 77506, or wherever he may be found. Pasadena may also be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving it in the manner prescribed by Texas State law for serving a summons or like process (a citation in Texas State courts) on such a Defendant. Texas Civil Practice and Remedies Code 17.024(b) reads, "In a suit against an incorporated city, town, or village, citation may be served on the mayor, clerk, secretary, or treasurer." Therefore, Pasadena may also be served with process by serving its clerk, secretary, or treasurer wherever any such person may be found. Pasadena acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

4.      Defendant Martin E. Aguirre (sometimes referred to herein as "Mr. Aguirre" or "Officer Aguirre") is a natural person who may be served with process at his place of employment,

Pasadena Police Department,  1201 Davis Street, Pasadena, Texas  77506.  Mr. Aguirre, upon information and belief, may reside and be served with process at 5045 Crenshaw Road, Apt. 921, Pasadena, Texas 77505.  Mr. Aguirre may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Aguirre at Mr. Aguirre's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Aguirre is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Aguirre was employed by City of Pasadena at all such times and acted or failed to act in the course and scope of his duties for City of Pasadena.

5.      Defendant Joanna S. Marroquin (sometimes referred to herein as "Ms. Marroquin," "Officer Marroquin," or "PSO Marroquin") is a natural person who may be served with process at her place of employment, Pasadena Police Department,  1201 Davis Street, Pasadena, Texas 77506.  Ms. Marroquin, upon information and belief, may reside and be served with process at 3108 Redfield Drive, Pasadena, Texas 77503.  Ms. Marroquin may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Marroquin at Ms. Marroquin's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Marroquin is being sued in her individual capacity, and she acted at all relevant times under color of state law. Ms. Marroquin was employed by City of Pasadena at all such times and acted or failed to act in the course and scope of her duties for City of Pasadena.

6.      Defendant Darlene McCain a/k/a Rita M. McCain (sometimes referred to herein as "Ms. McCain," "Officer McCain," "PSO McCain," or "PSO Supervisor McCain") is a natural person who resides, is domiciled, and may be served with process at, upon information at belief,

1600 Dickinson Avenue, Trailer 106, Dickinson, Texas 77539.  Ms. McCain may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. McCain at Ms. McCain's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. McCain is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Ms. McCain was employed by City of Pasadena at all such times and acted or failed to act in the course and scope of her duties for City of Pasadena.

7.     Defendant Ryan W. Whitehead (sometimes referred to herein as "Mr. Whitehead" or "Officer Whitehead") is a natural person who may be served with process at his place of employment, Pasadena Police Department,  1201 Davis Street, Pasadena, Texas  77506.  Mr. Whitehead, upon information and belief, may reside and be served with process at 10928 Pinewood Court, La Porte, Texas  77571.  Mr. Whitehead may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Whitehead at Mr. Whitehead's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Whitehead is being sued in his individual capacity, and he acted at all relevant times under color of state law. Mr. Whitehead was employed by City of Pasadena at all such times and acted or failed to act in the course and scope of his duties for City of Pasadena.  All natural person Defendants (Martin E. Aguirre, Joanna S. Marroquin, Darlene McCain a/k/a Rita M. McCain, and Ryan W. Whitehead) in this case are collectively referred to in this complaint as the "Individual Defendants."

### B.     Jurisdiction and Venue

8.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant

to a federal statute providing for the protection of constitutional rights.  This suit arises under the United States Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA").  The court has personal jurisdiction over City of Pasadena because it is a Texas city.  The court has personal jurisdiction over Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.

9.      Venue is proper in the Houston Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Harris County, which is in the Houston division of the United States District Court for the Southern District of Texas.

II.      Factual Allegations

A.      Introduction

10.     Plaintiffs provide in the factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done their best to do so accurately and without any typographical errors.

B.      Jamal's Death

        1.      Introduction

11.      Jamal was born in 1986, and he was only 32 years old at the time of his tragic and unnecessary death.  Jamal suffered and died as a result of Defendants assaulting him, including tasing him and restraining him in handcuffs and/or a restraint chair in the City of Pasadena jail on March 28, 2019.  Jamal was removed from life support on March 29, 2019 and was survived by family members including his mother, father, wife, and three minor children.  Jamal was African-American, unlike the officers who assaulted him.  Individual Defendants' actions, deliberate indifference, and objective unreasonableness, and City of Pasadena's policies, practices, and/or customs, caused, were proximate causes of, and/or were producing causes of Jamal's suffering and death and all other damages sought and/or referenced in this pleading.  Individual Defendants "seized" Jamal, a pretrial detainee, in the constitutional sense.  They also used excessive force, failed to provide reasonable medical care, and engaged in unconstitutional punishment.

        2.      Prior Arrests and Incarceration by Pasadena Police Department

12.      City of Pasadena, and upon information and belief one or more Individual Defendants, were aware of and familiar with Jamal due to prior arrests and incarceration in the City of Pasadena jail.  Upon information and belief, all Defendants were aware that Jamal had substance abuse and mental health issues.  Jamal had been arrested a number of times, most often for alleged public intoxication.  Upon information and belief, some or in the alternative most such arrests actually occurred as a result of Jamal experiencing the effects of significant seizures.  Even though arresting officers knew that Jamal had seizures, they would arrest him for public intoxication regardless.  Defendants' knowledge, upon information and belief, of Jamal's seizure

disorder, mental health issues, and drug abuse issues support their liability for damages in this pleading, including Jamal's death.

13.     The following table reflects prior City of Pasadena arrests for which Plaintiffs have records at the time this complaint was drafted.  Plaintiffs will need to conduct discovery to plead their best case, as Plaintiffs expect that they do not possess all material records from City of Pasadena regarding such prior arrests.  City of Pasadena, as to virtually all the primary, material documents and recordings related to Jamal's death, refused to provide such records. Plaintiff Donna Thomas had to file a Rule 202 petition in state court, and her attorney had to participate in an evidentiary hearing at which City of Pasadena continued to refuse to provide evidence regarding Jamal's death.  Fortunately, the state court judge granted the Rule 202 petition.  Thus, Plaintiffs are informed and believe that City of Pasadena may have withheld documents and records obtained through one or more Public Information Act requests.

14.     Plaintiffs obtained information in the table below from City of Pasadena book-in reports.  Plaintiffs do not, by providing such information, necessarily allege or agree that all of the information is true.  Rather, Plaintiffs provide the following table to show some likely facts which indicate Defendants' familiarity with Jamal and some of his issues which are material to claims in this case.

| Date | Arresting Officer | Booking Officer | Fingerprint Officer | Search Officer | Charge | Jail Alerts |
|---|---|---|---|---|---|---|
| 06/25/16 | Benge, S. | Moore, Z. F. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 06/28/16 | Salazar, J. | Teel, S. C. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 07/01/16 | Benge, S. | Wade, K. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |

| Date | Arresting Officer | Booking Officer | Fingerprint Officer | Search Officer | Charge | Jail Alerts |
|---|---|---|---|---|---|---|
| 07/02/16 | Smith, H. M. | Wade, K. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 07/08/16 | Ragsdale, T. A. | Whitehead, R. | N/A | N/A | Criminal Trespass | Drug User and Mental Health Issues |
| 07/25/16 | Quintanilla, M. | Robles, L. | N/A. | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 08/04/16 | Garza, D. | Whitehead, R. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 08/06/16 | Sanders, C. B. | Teel, S. C. | N/A | N/A | Criminal Trespass; Public Intoxication | Drug User and Mental Health Issues |
| 08/17/16 | Sanders, C. B. | McCain, R. D. | N/A | N/A | Criminal Trespass | Drug User and Mental Health Issues |
| 08/24/16 | Thornton, R. | Rhodes, R. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 09/10/16 | Adams, K. L. | Cortes, A. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 09/13/16 | Werner, B. | Robles, L. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 09/15/16 | Turner, M. C. | Wade, K. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 09/24/16 | Benitez, J. J. | Salazar, S. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 10/20/16 | Martinez, B. R. | Rhodes, R. | N/A | N/A | Public Intoxication; Theft | Drug User and Mental Health Issues |
| 06/23/17 | Wilson, S. C. | Moore, Z. F. | N/A | N/A | Burglary Building Public Intoxication | Drug User and Mental Health Issues |
| 01/12/18 | Salazar, J. | Cortes, A. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |

| Date | Arresting Officer | Booking Officer | Fingerprint Officer | Search Officer | Charge | Jail Alerts |
|---|---|---|---|---|---|---|
| 05/23/18 | Frederick, D. G. | Teel, S. C. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 10/14/18 | Tong, T. G. | Marroquin, J. | Varela, L. M. | Wingerson, B. | Public Intoxication | Drug User and Mental Health Issues |
| 10/19/18 | Bonsal, C. | Salazar, S. | Varela, L. M. | Varela, L. M. | Public Intoxication | Drug User and Mental Health Issues |
| 01/02/19 | Page, E. | Burden, D. | N/A | N/A | Public Intoxication | Drug User and Mental Health Issues |
| 01/16/19 | Perales, A. | Orozco, C. | Teel, S.C. | Thomas, R. L. | Public Intoxication | Drug User and Mental Health Issues |
| 01/17/19 | Giacomuzzi, M. R. | Cortes, A. | Thomas, R. L. | Orozco, C. | Public Intoxication | Drug User and Mental Health Issues |
| 02/13/19 | Fowler, S. J. | McCain, R. D. | Wingerson, B. | Whitehead, R. | Soliciting Without Permit | Drug User and Mental Health Issues |
| 03/28/19 | Argueta, L.L. | Villegas, L. | Valdez, G | Pina, F. | Public Intoxication | Drug User, Mental Health Issues |

15.     Upon information and belief, based upon this table, at least Defendants Marroquin, Whitehead, and McCain had specific knowledge about Jamal and some of his material issues, including his seizure disorder (Epilepsy).   Moreover, upon information and belief, Jamal's brother's significant other, Shay Allen, had taken Jamal's seizure medication to the Pasadena jail when Jamal was incarcerated in 2017 or 2018.  She recalls telling a Pasadena jail employee that the medication was for Jamal's seizures, and the employee kept the medication presumably to be provided to Jamal.  Upon information and belief, one or more others may have taken Jamal's medication to the jail, and receipt of such seizure medication should be reflected in Pasadena records.

     3.     Jamal's March 28, 2019 Arrest and Incarceration, and March 29, 2019 Death

     a.     Arrest and Transport to Jail

16.     Pasadena police officers made contact with Jamal at a Shell gas station in Pasadena at approximately 2:00 a.m. on March 28, 2019.  Police officers initially believed that Jamal was a possible suspect in a reported assault, but they quickly realized that Jamal had not assaulted anyone.  Regardless, Officer L. Arguetta decided to arrest Jamal for allegedly being intoxicated by a substance other than alcohol.  Pasadena Police Officers had a conversation with Jamal, after he was in handcuffs.  A portion of that conversation follows:

| | |
|---|---|
| Pasadena Police Officer: | Are you the one that we took to the hospital? |
| Jamal: | I'm the same guy. [inaudible] I don't know why y'all keep getting called on me. I haven't done anything. |
| Pasadena Police Officer: | Well, that day you were passed out in the middle of a parking place. That's why you went that day. |
| Jamal: | Yeah, I had a seizure. |
| Pasadena Police Officer: | You had a seizure? |
| Jamal: | Yeah |

\* \* \*

| | |
|---|---|
| Pasadena Police Officer: | Okay. You were still passed out in a parking lot. Whenever we got here. |
| Jamal: | I don't want to say. |
| Pasadena Police Officer: | I'm sorry? I mean, that's what happened, when me and the other officer got here you were laying in a parking spot sleeping. |
| Jamal: | I had a seizure, I was passed out, I wasn't sleeping, I was passed out. |

| Pasadena Police Officer: | Well, when I said you were passed out, you corrected me, said it's because you had a seizure, that you were unconscious in a parking spot, Correct? |
|---|---|
| Jamal: | Yeah, unconscious. |

* * *

| Pasadena Police Officer: | Are you having a seizure right now?  We need to know if you are having a seizure right now? |
|---|---|
| Jamal: | No. Last time we did this he said he was passed out in the parking lot. |

Moreover, Pasadena police attempted to get Jamal to leave the City:

| Pasadena Police Officer: | Okay I've got a solution to this. So this don't keep happening. Why don't you go out of Pasadena? |
|---|---|
| Jamal: | Why do I got to go out of Pasadena? |

* * *

| Pasadena Police Officer: | Y'all are all about to have to move out of here because you can't stay in Pasadena like this. [crosstalk].  Okay well here's the deal, that way on the freeway, that next light is Houston, that's where you need to be. |
|---|---|

17.     Pasadena police transported Jamal to the City of Pasadena jail, without incident, shortly thereafter.  Upon information and belief, Jamal did not then, nor did he ever during any prior interaction with any City of Pasadena police officer and/or other City of Pasadena employee, threaten to assault or actually assault any such person.

### b.    Defendants' Assault of Jamal During His Seizure

18.     Jamal was booked-in to the jail and placed into a single cell.  Jamal remained in that cell for a period of time and was then moved to a cell in which several other inmates were housed.

19.    At approximately 6:15 a.m., very shortly after being moved to the multi-inmate cell with several other inmates, inmates in that cell reported to jail staff that Jamal was having a seizure. They knew that he was having a seizure, because it was clearly evident to even a layperson, such as Jamal's cellmates, that Jamal was having a seizure.  Individual Defendants responded to the cell as more fully described in the summary timeline below.  Individual Defendants decided to restrain Jamal, contrary to common knowledge possessed by the vast majority of the population and, upon information and belief, Individual Defendants, when dealing with a person in the midst of a seizure and/or in the postictal state/phase.  When that attempt failed, Individual Defendants decided to tase and assault Jamal.  The tasing and assault continued over a lengthy period of time, after which Jamal was handcuffed and strapped into a restraint chair.  EMS ultimately injected Jamal with Versed, which upon information and belief did not cause or contribute to Jamal's death or suffering.  Jamal had apparent heart failure in an ambulance on the way to the hospital, but was revived.  Jamal died on March 29, 2019, at approximately 12:15 p.m., after being removed from life support.

20.    The following timeline reflects a general summary of certain events occurring during Jamal's seizure and assault of him by one or more Individual Defendants, as described in this pleading.  Plaintiffs do not, by listing times, necessarily agree that the events occurred at those exact times.  Rather, Plaintiffs provide times to establish a general sequence of events and approximation as to time between certain events.  Times are listed for the date March 28, 2019.

> 02:32:01 - Jamal Shaw is brought into the booking area by Officer Argueta. Jamal is booked in without incident and placed in the holding area
>
> 02:57:42 - Jamal Shaw first appears being placed into cell 1700.
>
> 06:07:05 - PSO Marroquin is escorting Jamal Shaw from Cell 1700 to Cell H.
>
> 06:07:23 - Jamal Shaw appears on camera and had just been placed in Cell H.

06:15:15 - Jamal falls to the floor and is clearly having a seizure.

06:15:51 - Prisoners in the cell move toward the cell door and call for assistance.

06:16:05 - PSO Marroquin looks into Cell H.

06:16:55 - PSO Marroquin and PSO Whitehead go to Cell H and begin moving prisoners to Cell A.  Jamal is clearly, visibly having a significant seizure.

06:17:15 - PSO Marroquin and PSO Whitehead enter Cell H, and Jamal visibly continues having a seizure while PSO Whitehead and PSO Marroquin stand and watch.  They will stand and watch for only approximately 1 minute before they decide to use force against a man in the midst of a seizure.

06:18:14 - PSO Whitehead and PSO Marroquin put hands on Jamal Shaw while Jamal continues, as was clearly visible, having a significant seizure.  PSO Whitehead and PSO Marroquin then continue doing the last thing they should have done, putting hands on and attempting to restrain Jamal in the midst of a seizure.  Jamal, predictably, and as was expected by PSO Whitehead and PSO Marroquin, involuntarily resists being restraint.  Thus, Jamal was not voluntarily resisting at all, and thus is not even passively resisting.  PSO Whitehead and PSO Marroquin knew this, and they knew that Jamal's reactions to being handled and assaulted were involuntary and a result of his body's natural defense against being assaulted in the midst of a seizure.  PSO Whitehead and PSO Marroquin continue doing the last thing they should have done, for several minutes, by attempting to restrain Jamal in the midst of a significant seizure.  Jamal's body, as would anyone in the midst of a significant seizure or in the postictal state, involuntarily reacts being restrained.  PSO Whitehead even drags Jamal more than once across the floor.  There is no detention– or law enforcement-related reason for the force PSO Whitehead and PSO Marroquin continue to use with Jamal, while at one point they collectively drag him across the floor again, and attempt to place him in a prone position.  Jamal is experiencing an obvious and apparent medical episode – an epileptic seizure – and he is being treated as if he is resisting arrest.  He is being treated in a patently unreasonable manner.

06:21:51 - PSO Marroquin removes her Taser from her holster.  She now intends to inflict pain on Jamal, who has done nothing wrong, and who is in the midst of a seizure and/or the postictal state.  She will punish Jamal simply as a result of his disability, and his body's reaction to being assaulted while in the midst of an epileptic seizure.  PSO Marroquin's removal of her Taser from her holster is the last thing one viewing the video expects, as a viewer expects an officer to act reasonably and not in substance torture Jamal.

06:21:54 - PSO Marroquin activates her Taser, as is evidenced by a light becoming visible in the video.  PSO Marroquin removes the Taser cartridge from the front of the Taser with her left hand while she holds the Taser in her right hand.  Upon information and belief, this indicates her intent to use the Taser for pain–compliance, to inflict Jamal with pain, by using the drive-stun mode.

06:21:57 - PSO Marroquin appears to attempt to or does deploy her Taser to Jamal's left side, through use of the drive-stun, pain infliction technique.  The Taser appears to make contact.  PSO Marroquin then stands to reposition herself so that she can continue to shock Jamal with the Taser as a result of him having a seizure, and in the midst of that seizure.  The Taser cartridge which PSO Marroquin had apparently removed appears to be visible on the cell floor.

06:22:07 – PSO Marroquin uses her Taser to apply the pain infliction, drive-stun technique to Jamal's right thigh, all while PSO Whitehead holds Jamal to the floor and assists with inflicting pain and restraining Jamal in the midst of a seizure and/or the postictal state.  Jamal continues writhing in pain, reacting to being restrained, held to the floor, and continuously shocked with the Taser.  Even though Jamal is not volitionally resisting the two officers, even if he were, it would be legally justified.  Jamal is being assaulted and tased simply because his body is having an involuntary seizure, and is reacting to assault by the two officers.  Jamal continues writhing, twisting, and moving in response to the infliction of pain.

06:22:20 - PSO Marroquin jams the Taser against Jamal's bare skin, on his left side above his beltline, and appears to once again use the drive-stun function of the Taser to inflict pain.  All the while, PSO Whitehead continues holding Jamal to the floor to allow PSO Marroquin to continue inflicting electrical shock pain.  PSO Marroquin, for the next several seconds, while Jamal continues writhing in pain, attempts to Tase Jamal again more than once.  The officers are relentless.

06:22:34 - PSO Whitehead loses hands-on contact with Jamal.  Jamal rolls somewhat away from the officers as his body naturally attempts to avoid the continued physical assault and injection of electricity into a system already at odds with itself as a result of electrical issues in Jamal's brain.  Jamal is able to stand and stumble away from the officers, towards the back of the cell.  At that point, the officers could exit the cell and re-evaluate the situation, in light of the assault and torture inflicted thus far.  They choose not to do so.  Jamal gets all the way to the back of the cell, squats down near the toilet, and attempts to collect himself and recover from the severe assault he had just sustained.  While it is not clear from the video how far away from the officers Jamal was at that time, it appears that he was at least 20 feet away or so.  The officers can easily exit the cell, or stand near the cell door to see whether Jamal continues seizing.  Instead, they walk toward Jamal, in the back of the cell in the confined toilet area partially divided by a half-wall.  PSO Whitehead and PSO Marroquin intend to continue to assault and inflict pain on Jamal.  (PSO Marroquin had picked up her Taser cartridge from the jail floor, as Jamal had begun to stumble toward the back of the cell).  Individual Defendants present at that time, including PSO Whitehead and PSO Marroquin, do not give Jamal even 15 seconds to recover.  They are on a mission, that being to assault and tase Jamal until he is strapped in a restraint chair.  They care little about getting Jamal any medical care.

06:22:49 - PSO Supervisor McCain enters Cell H.  PSO Supervisor McCain sees Jamal at the back of the cell, and she sees PSO Whitehead and PSO Marroquin approaching Jamal.

She likewise sees PSO Whitehead holding the Taser previously used by PSO Marroquin in PSO Whitehead's right hand, with the laser from the Taser visible on the floor. Thus, PSO Supervisor McCain understands what is about to occur, as shocking as it is. Jamal stands, and is wobbly. PSO Whitehead raises the Taser to chest level, illuminates Jamal's chest with the laser, and fires. PSO Marroquin and PSO Supervisor McCain watch with apparent approval. Jamal falls face-forward to the concrete cell floor and immediately turns his body, racked in pain. One wonders what was going through Jamal's mind at this point, if one can even examine the mind in the midst of a seizure, but one imagines that his mind is indicating that Jamal is likely to be killed by the three officers. Jamal's body reacts while electricity pulses through the Taser leads into his body. Jamal's body flails in horrible pain. PSO Whitehead keeps both hands on the Taser, while PSO Marroquin and PSO Supervisor McCain stand and watch. Any officer can intervene and stop what is occurring. All officers choose not to do so but instead to participate in assaulting Jamal as a result of him having a seizure.

06:23:02 – While Jamal continues to flail in pain, instead of helping him, PSO Supervisor McCain decides to join in the assault. PSO Supervisor McCain grabs Jamal by his right hand and drags him out of the toilet area, in the direction of the cell door, and drops him well short of the door. Approximately 7 seconds after Supervisor McCain drags Jamal across the floor, PSO Whitehead decides to, and apparently does, inject more electricity into Jamal's body by pulling the Taser trigger such that, upon information and belief, approximately 5-to-6 seconds of electricity are applied. PSO Marroquin continues to watch, not intervening. PSO Supervisor McCain grabs Jamal's right hand and/or wrist, followed shortly by PSO Marroquin grabbing what appeared to be Jamal's left forearm. Jamal continues moving, and partially rolling, in pain and confusion. It is difficult to watch.

06:23:31 – PSO Whitehead moves in close to Jamal, Taser in hand, while PSO Marroquin and PSO Supervisor McCain hold Jamal to the ground. PSO Whitehead injects more electricity into Jamal at approximately 6:23:33, such electricity being applied for 5-to-6 seconds. Jamal continues to react to the pain and torture, by physically moving.

06:23:40 - Acadian ambulance arrives in the jail sally port. However, this does not stop officers from assaulting Jamal. Jamal needed medical assistance long before the ambulance arrived. Instead, Individual Defendants provided physical restraint, assault, and tasing.

06:23:41 - PSO Whitehead removes a cartridge from PSO Marroquin's Taser. Approximately three seconds later, PSO Whitehead moves onto Jamal with Taser in hand. Jamal's body is then out of view of the camera, but the three officers can be partially seen holding and/or assaulting Jamal on the ground, with PSO Whitehead apparently inflicting more pain to Jamal through the Taser drive-stun, pain-inflicting technique. Officers appear to continue assaulting and restraining Jamal, once again in the midst of a seizure or the postictal state. Jamal continues to react in pain and his body's likely perception that Jamal is being killed. In the end, this proved to be correct.

06:24:15 - PSO Whitehead is not finished assaulting Jamal. He stands up and loads a spare cartridge onto the Taser. He points the Taser at Jamal approximately 6 seconds later and appears to pull the trigger. All officers continue attempting to restrain Jamal on the floor and eventually apparently put him into a prone position at about the time that Officer Aguirre is seen entering the cell.

06:24:21 - Jamal is rolling around on his back, and PSO Whitehead points the Taser at him.

06:24:40 - Officer Aguirre enters the cell and goes "hands on" with Jamal. With the assistance of PSO Whitehead, PSO Marrocain, and PSO Supervisor McCain, Officer Aguirre attempts to handcuff Jamal. There are now four officers involved in assaulting and attempting to restrain Jamal, whose body is exhausted, has been shocked, and has experienced blunt-force injuries. The end result was predictable. Officer Aguirre does not assess the situation. Upon information and belief, he does not ask any questions about what Jamal has experienced, how many times he had been tased, whether he is in the midst of a seizure, or any other relevant information. Instead, he immediately resorts to use of force, in conjunction with the three other officers.

06:24:50 - Ambulance personnel enter the jail with a stretcher. Four officers continue holding Jamal to the floor, upon information and belief, in a prone position for some period of time, restricting his movement, while he is in the midst of a seizure or the postictal state.

06:26:30 - Officer Aguirre has Jamal handcuffed behind Jamal's back.

06:27:27- PSO Marroquin exits Cell H to retrieve a restraint chair.

06:27:39 - Officer Aguirre and PSO Whitehead pick up Jamal, who is now handcuffed, and remove him from the cell. Jamal stumbles and appears unable to stand on his own.

06:27:50 – Immediately upon exiting the cell, Jamal falls to his knees. He is then lifted by the two officers and strapped into a restraint chair.

06:28:00 - Jamal Shaw is strapped into a restraint chair

06:29:36 - Jamal Shaw is rolled into the booking area by PSO Whitehead, and the chair is stopped in the booking area. Approximately 50 seconds later, as EMTs evaluate Jamal, it is clear from his body movements that he is still distraught, as well as exhausted. Upon information and belief, he continues to be confused, being in the postictal state. He then receives treatment by EMTs, as described elsewhere in this pleading. However, as a result of Individual Defendants' actions, it is too late for Jamal. There is nothing that healthcare providers can do for him. Jamal has suffered at the hands of Individual Defendants, and he will now die as a result.

c.      Taser Download

21.     City of Pasadena downloaded information from the Taser Individual Defendants

used to assault Jamal.  Plaintiffs do not, by listing information in the table below, necessarily agree

that it is correct.  Plaintiffs have not had an opportunity to examine the Taser at issue and/or the

process by which data was allegedly obtained during the download.  Upon information and belief,

the data download included the following information:

| Date | Time | Event | Deployed (in seconds) |
|------|------|-------|-----------------------|
| March 28, 2019 | 06:04:32 | Armed | N/A |
| March 28, 2019 | 06:04:34 | Safe | 2 |
| March 28, 2019 | 06:29:03 | Armed | N/A |
| March 28, 2019 | 06:29:05 | Trigger | 5 |
| March 28, 2019 | 06:29:16 | Trigger | 5 |
| March 28, 2019 | 06:29:30 | Trigger | 5 |
| March 28, 2019 | 06:29:37 | Trigger | 5 |
| March 28, 2019 | 06:29:45 | Safe | 42 |
| March 28, 2019 | 06:29:53 | Armed | 30 |
| March 28, 2019 | 06:30:02 | Trigger | 5 |
| March 28, 2019 | 06:30:18 | Trigger | 6 |
| March 28, 2019 | 06:30:42 | Trigger | 5 |
| March 28, 2019 | 06:30:47 | Safe | 54 |
| March 28, 2019 | 06:30:54 | Armed | N/A |
| March 28, 2019 | 06:30:54 | Trigger | 5 |
| March 28, 2019 | 06:31:10 | Trigger | 5 |
| March 28, 2019 | 06:31:24 | Safe | 30 |
| March 28, 2019 | 06:31:25 | Armed | N/A |
| March 28, 2019 | 06:31:30 | Trigger | 2 |
| March 28, 2019 | 06:31:32 | Safe | 7 |
| March 28, 2019 | 06:32:33 | Armed | N/A |
| March 28, 2019 | 06:32:35 | Safe | 2 |

However, there was an approximate 7-minute, 9-second discrepancy between the Taser data and

jail camera footage.  Defendant Marroquin first activated his Taser at 6:21:54, according to jail

cameras, while the Taser download indicates the first Taser activation was at 6:29:03.

22.     Sergeant S.A. Simpson, in connection with his investigation of Jamal's assault and

death, spoke with Officer J. Bright.  Officer Bright was with the Pasadena Police Department

Personnel and Training Division.  Officer Bright explained to Sergeant Simpson that "drive-stun" refers to using electrodes on the front of a Taser.  A Taser is a type of CEW – "Conducted Electrical/Energy Weapon."  It is designed to inflict pain on a subject, and/or interrupt a subject's central nervous system, through the use of electricity.  Officer Bright explained to Sergeant Simpson that using a Taser in drive-stun mode "should be considered a pain compliance technique."  Thus, Individual Defendants, whether through direct use of the Taser or the failure to stop such use, engaged in inflicting physical pain on Jamal, a person in the midst of a seizure, who had been convicted of nothing and arrested only for alleged public intoxication.  Officer Bright also explained that, when a Taser deployment creates neuro-muscular incapacitation, the person tased cannot breathe.  Thus, said Officer Bright, exposing a tased person to such a situation for over 15 continuous seconds, or three full continuous cycles, can be dangerous.  He also said that Taser recommends providing a tased person breaks in tasing when practicable.

23.    Sergeant Simpson determined, after reviewing the Taser download report and video surveillance footage, that there were allegedly 10 taser activations.

> Trigger events 1, 2, and 3 were attempted applications of the drive-stun "pain compliance technique" by PSO Marroquin. Trigger event 4 was a Taser activation at 6:29:29, in preparation for drive stun by PSO Marroquin; however, due to a body positioning change she was unable to make contact with Mr. Shaw. Trigger events 5, 6 and 7 were activations by PSO Whitehead which utilized positive probe contact. Trigger event 6 also shows to have an activation time of 6 seconds. This is attributed to continuous trigger depression during the length of the cycle, in which case the Taser will cycle until the trigger is released. Trigger events 8 and 9 were attempted drive-stun "pain compliance technique" applications. Trigger event 10 was a Taser malfunction (fail to fire) at 06:24:21 after a new cartridge was installed by PSO Whitehead.

Once again, because Plaintiffs have not had the opportunity to examine the Taser and/or the download process, Plaintiffs do not necessarily agree that all assertions in the immediately preceding block quotation are accurate.

4.        Witnesses

a.        Aguirre, M.E. – Day Shift Patrol Division

24.        Police Service Officer ("PSO")[1] Aguirre was allowed to complete a written statement, as opposed to being questioned and having to give answers as other citizens would give to a law enforcement officer investigating an in-custody death.  Officer Aguirre admitted that, during Jamal's seizure, Officer Aguirre was assigned to the Pasadena police station front desk.  He was dispatched to the jail to help jail staff with restraining Jamal in the midst of a seizure.  He alleged that Jamal was not cooperating with jail staff instructions.  Upon information and belief, he knew that Jamal was unable to cooperate with jail staff instructions because he was in the midst of a seizure and/or the postictal state.  Regardless, he assisted in improperly restraining Jamal through use of handcuffs assisted in the assault of Jamal as indicated with more specificity elsewhere in this complaint.

b.        Alonso, Bryan - Inmate

25.        Mr. Alonso told Detective J. Stephens that Jamal was only in cell H briefly before he started having a seizure.  Mr. Alonso was moved to a different cell while Jamal was having a seizure.  He was asked whether Jamal was fighting back against officers, and he said that he could not determine whether Jamal was seizing or fighting.  Mr. Alonso obviously did not have the in-person, up-front view of Jamal during his seizure and assault of him by the officers, as did Individual Defendants.  Regardless, inmate Alonso, as well as Individual Defendants, knew that a

---

[1]   Plaintiffs are uncertain as to words underlying the acronym "PSO."   However, Plaintiffs reviewed at least one Pasadena document indicating that "PSO" likely stands for "Police Service Officer."

person suffering a significant seizure could have body movements which may appear, absent knowledge of the seizure, as being aggressive towards those surrounding the person.   Upon information and belief, Individual Defendants knew that Jamal was suffering the effects of a seizure and was not volitionally or intentionally fighting the officers.   In fact, upon information and belief, it was impossible for Jamal to make any conscious or volitional decision as to how to use any portion of his body during the seizure or in the postictal state.   Mr. Alonso also said that Jamal was screaming and was scared.   He recognized what, upon information and belief all Individual Defendants recognized: when a person has a seizure, the person does not know what he or she is doing.   Materially, he cannot resist restraint or arrest because he cannot formulate the volition to do so.

### c.      Ayala, Reynaldo - Inmate

26.      Mr. Ayala told Detective C. MacGregor that he had been in Cell H with Jamal.   He said that, after Jamal was in the cell for a short period of time, Jamal fell to the ground and began having what Mr. Ayala perceived to be a seizure.   Upon information and belief, Mr. Ayala had no medical training.   Mr. Ayala also said that, after jail staff were notified of the emergency, all inmates in Cell H were relocated to other cells.   This left Jamal in Cell H, while Jamal was having a seizure.

### d.      Barboza, Jessica - PSO

27.      PSO Jessica Barboza was working Master Control at the City of Pasadena jail when Jamal was assaulted and killed by Individual Defendants.   Her typical schedule was to work weekdays only.   She recalled that someone in Cell H pushed a button, initiating communication with her, and the person said that someone was having a seizure.   She then informed PSO

Whitehead and/or PSO Marroquin. PSO Barboza's recollection was that she told PSO Whitehead that someone was having a seizure in Cell H. PSO Supervisor McCain was working booking. She was able to see the cell through a screen in her work area, but that single screen contained what she referred to as "a little" portion for each cell. PSO Barboza admitted that she did not enlarge the small box on the screen depicting Jamal's cell, so that she could actually observe what was going on while Jamal was being assaulted.

28.     PSO Barboza also indicated that PSO Supervisor McCain was doing court paperwork, and kept asking PSO Barboza, "Are they fighting? Are they fighting?" PSO Barboza initially responded, "No." However, once she saw more movement, she told PSO Supervisor McCain. It was at that point that PSO Supervisor McCain went to the cell. PSO Supervisor McCain should have gone to the cell long before she did, as she evidenced concern by asking the same question over and over. Upon information and belief, she supervised both PSO Whitehead and PSO Marroquin and could direct their action and/or inaction.

29.     PSO Barboza admitted that she knew of Jamal from prior contacts. She said that she knew his name from "running him" and him being in the Pasadena jail. She said that she had never had to deal with him but was aware of those prior jail incarcerations. The first time she visibly saw him, in person, was after the assault by Individual Defendants she saw him when he was on a stretcher after being unstrapped from the restraint chair.

e.     Byerly, David – EMT

30.     Investigators did not interview EMT David Byerly until months after Jamal's death. Mr. Byerly arrived at the jail when Jamal was being assaulted, and he saw that Jamal had Taser prongs in his chest and Taser wires all wrapped up on him. He observed what he thought was a

"jailer" come out to get the restraint chair.  Mr. Byerly suggested that they put Jamal onto a stretcher.  However, the "jailer" made the decision to put Jamal onto a restraint chair.

31.     When in the booking area, one or more Individual Defendants told Mr. Byerly that Jamal had a seizure while he was in his cell.  Mr. Byerly, as was upon information and belief true for one or more Individual Defendants, was familiar with Jamal by sight.  When he heard Jamal's name, he knew that he had previously picked up Jamal several times for health issues.  Upon information and belief, at least some Individual Defendants knew that Jamal had previous calls for medical service related to drugs and/or having seizures.  EMT Byerly also said that Jamal was yelling, "Help me! Help me!"  However, when people attempted to speak to Jamal, he would not respond to questions.  This was due to Jamal's seizure and not a volitional act.

### f.     Ford, Kelli - EMT

32.     EMT Kelli Ford, with Acadian Ambulance, also gave a statement months after the occurrence.  If Pasadena had been interested in conducting a complete investigation, it would have interviewed Ms. Ford and Mr. Byerly much earlier.  Regardless, Ms. Ford said that there were several what she thought were "guards" on top of Jamal when he was in the cell.  She observed that Jamal was handcuffed, when he was being carried out of the cell.  Ms. Ford asked, presumably to provide appropriate medical care, if they wanted medical personnel to put Jamal onto a stretcher.  She said that the "jailers" said "no," that they were going to put Jamal into a restraint chair.  She said that it was difficult to obtain Jamal's vital signs, because he was sweaty and moving.  However, she was able to determine that Jamal's heart rate was elevated.

33.     Ms. Ford observed, as the ambulance was pulling out of the sally port at the Pasadena jail, that Jamal became unresponsive.  Ms. Ford was driving the ambulance, and she stopped.  She jumped into the back, and medical personnel began working on Jamal for cardiac

arrest.  She also observed, while they were still in the jail, that Jamal was yelling things and asking for his mother.  The fact that Jamal was asking for his mother was further evidence that he was not in his right mind, as all people present observed and knew.  Ms. Ford also saw that Jamal was unable to calm down and would not respond to any questions.  This was not unusual, because Jamal was still in the midst of a seizure and/or in the postictal state.  The postictal state is the altered state of consciousness after an epileptic seizure.  It usually lasts between 5 and 30 minutes, but sometimes longer in the case of a larger or more severe seizure.  It is characterized by drowsiness, confusion, nausea, hypertension, headache or migraine, and other disorienting symptoms.  It can also include aggressiveness, if the person is being assaulted and/or restrained.

<h3 style="text-align:center">g.      Guerrero, Juan – Inmate</h3>

34.    Mr. Guerrero told Detective J. Stephens that Jamal was given toilet paper by a person in Cell H shortly after Jamal entered the cell.  Jamal thanked the other person.  When Mr. Guerrero heard other inmates say that Jamal was having a seizure, Mr. Guerrero got up and went to the front of the cell.  After all inmates were relocated to a different cell, while Jamal was having a seizure, Mr. Guerrero indicated that Jamal was not staying still and was "growling."  Mr. Guerrero did not hear or see a Taser.

<h3 style="text-align:center">h.      Loya, Santiago - Inmate</h3>

35.    Mr. Loya told Detective C. MacGregor that he had been in Cell H with Jamal.  He said that, after Jamal was in the cell for a short period of time, Jamal fell to the ground and began having what Mr. Loya perceived to be a seizure.  Upon information and belief, Mr. Loya had no medical training.  Mr. Loya also said that, after jail staff were notified of the emergency, all inmates in Cell H were relocated to other cells.  This left Jamal in Cell H, while Jamal was having a seizure.

i.      McCain, Darlene – Day Shift PSO Supervisor

36.      PSO Supervisor McCain was allowed to complete a written statement, as opposed to being questioned and having to give answers as other citizens would give to a law enforcement officer investigating an in-custody death.  PSO Supervisor McCain indicated that, when she entered Cell H to assist in restraining Jamal, she saw Jamal standing in the shower/toilet area.  PSO Supervisor McCain admitted that she knew Jamal had just been tased.

37.      As indicated elsewhere in this complaint, PSO Supervisor McCain is individually liable as a result of her own action and inaction.  Aside from such specific action and inaction, as a supervisor of PSO Whitehead and PSO Marroquin, and her proximity to occurrences during which Jamal was begin assaulted, she also has supervisor liability.

j.      Marroquin, Joanna – Day Shift PSO

38.      Officer Marroquin was allowed to complete a written statement, as opposed to being questioned and having to give answers as other citizens would give to a law enforcement officer investigating an in-custody death.  Officer Marroquin admitted that, when she entered Cell H at approximately 6:17 a.m., she observed Jamal on the floor, convulsing, and foaming at the mouth.  Oddly, she instructed Jamal to calm down and breath.  She also indicated that he did not respond, which was no surprise to her or other Individual Defendants.  Contrary to, upon information and belief, her and other Individual Defendants' knowledge and training, Officer Marroquin attempted to move Jamal in the midst of a seizure.  She also attempted to restrain Jamal's legs.  None of Jamal's actions, as Individual Defendants upon information and belief knew, from the time his seizure began until the time of his death, were volitional or intentional. Instead, Individual Defendants knew that such actions described in this pleading were simply

normal involuntary responses, by a person who is undergoing a significant seizure, to people attempting to restrain and/or assault (or actually assault through use of a Taser or otherwise) the person.

39.     Officer Marroquin eventually disengaged with Jamal and instructed Officer Whitehead to do the same. They should have then left the cell and allowed Jamal to remain alone in the cell, for the seizure to conclude, Jamal to recover, and EMTs to arrive. However, neither Ms. Marroquin nor Ms. Whitehead intended to do so. Individual Defendants would not be satisfied until they had physically restrained Jamal, handcuffed him, and strapped him into a restraint chair.

40.     They observed Jamal get up and stumble toward the restroom area of Cell H. They also observed Jamal hit his head on the wall. Oddly, once again, Jamal was told to stop and get on the floor. Jamal did not have the cognitive ability to follow any commands, because he was having a seizure and/or was in the postictal state. Regardless, and with this knowledge, Officer Marroquin gave the Taser to Officer Whitehead. Officer Whitehead, unbelievably, reinserted the cartridge and shot Jamal. The Taser barb(s) struck Jamal in the chest. Jamal fell in response. This was clear, unabashed punishment and use of nonsensical and thus unreasonable force.

41.     Every Individual Defendant who had any knowledge regarding use of a Taser knew that it is inappropriate to shoot a Taser into a person's chest. It can cause cardiac arrest and/or other significant physical issues. Moreover, upon information and belief, every Individual Defendant knew that a person undergoing a seizure should not be tased. Further, upon information and belief, all Individual Defendants knew that a seizure involves uncontrolled electrical activity in the brain, causing temporary abnormalities in muscle tone movements (stiffness, twitching, or limpness), behaviors, sensations, and/or altered states of awareness.

42.     Despite this knowledge, Officer Whitehead attempted to use the drive-stun pain infliction technique on Jamal.  Not long thereafter, Officer Aguirre entered the cell to assist with restraining Jamal.  Once again, any attempt to restrain Jamal, tase Jamal, assault Jamal, handcuff Jamal, and/or strap Jamal into a restraint chair was completely contrary to, upon information and belief, training received and/or knowledge possessed by Individual Defendants regarding how to deal with a person in the midst of a seizure.  Regardless, Jamal was strapped into a restraint chair and moved to the jail booking area.

43.     Officer Marroquin observed that Jamal, in a restraint chair in the booking area, was still "incoherent and resisting."  It was clear to Individual Defendants, upon information and belief, that Jamal was incoherent because he was still in the midst of a seizure and/or the postictal state.  Any reference or allegation by Defendants that Jamal was resisting is false, because Jamal had no cognitive ability to do so.  Any body movements referenced by Defendants which Defendants allege was being volitionally aggressive were simply body movements over which Jamal had no control.  Upon information and belief, Individual Defendants knew this to be true and assaulted and restrained Jamal nonetheless.

### k.     Morales, Juan Rodriguez – Inmate

44.      Mr. Morales told Detective R. Guerra that Jamal had been standing next to Mr. Morales, in the cell, for just several minutes before Jamal suffered a seizure.  Mr. Morales observed Jamal drooling, and then Jamal began to fall towards Mr. Morales.  Mr. Morales then went to the front of the cell to alert Pasadena jail staff.  Mr. Morales, upon information and belief, a person not medically trained, had the opinion that Jamal then began to have a seizure.  Mr. Morales, like Individual Defendants, even without medical training, was clearly able to determine by observing Jamal that Jamal was in the midst of a seizure.

l.        Rivera, Jason Andrew – Inmate

45.      Mr. Rivera told Detective R. Guerra in substance that Jamal had woken him and asked for some toilet paper before having a seizure.  Mr. Rivera gave Mr. Shaw some toilet paper and then went back to sleep.  He then woke up when he heard someone fall, that someone being Jamal, and he overheard someone saying that Jamal was having a seizure.  Upon information and belief, as with other inmates in the cell with Jamal, Mr. Rivera did not have or need any medical training to understand that Jamal was having a seizure and was not engaging in voluntary movements.

m.       Whitehead, Ryan – Day Shift PSO

46.      Officer Whitehead was allowed to complete a written statement, as opposed to being questioned and having to give answers as other citizens would give to a law enforcement officer investigating an in-custody death.  Officer Whitehead admitted that he assisted in moving all inmates (other than Jamal) from Cell H into Cell A.  He also admitted that, at that point, when Jamal was the only inmate left in Cell H, he saw Jamal on the ground convulsing.  He also observed that Jamal had saliva on and around his mouth.  Officer Whitehead thus knew that Jamal was having a serious medical issue, a seizure, and he requested an ambulance over the jail radio.  Even so, he then tried to "control" Jamal in the midst of Jamal having a seizure.  Any request for medical attention for Jamal was not material and was in fact perfunctory.  Individual Defendants did not wait for medical personnel to arrive, to assist Jamal with his serious medical needs, but instead chose to assault and restrain Jamal.  It makes little sense to request medical treatment and then, instead of waiting for and allowing medical personnel to treat a person in the midst of a serious

seizure, physically assault and restrain the person contrary to common knowledge about how to treat a person in the midst of a seizure.

47.     Officer Whitehead observed that Jamal would "move across the floor" and was not answering commands.  Clearly, as Individual Defendants knew, upon information and belief, Jamal was not able to "answer commands" or make any appropriate volitional body movements in the midst of a seizure.  Despite this knowledge, Officer Whitehead decided to use a Taser on Jamal.  Officer Whitehead also admitted, when Jamal got up and stumbled toward the bathroom area in the cell, Officer Whitehead took possession of the Taser and shot it at Jamal, striking him in the chest.  Officer Whitehead also admitted that shooting the Taser at Jamal caused Jamal to fall to the ground.

5.      Medical Records/Death Reports

a.      EMT Medical Records

48.     EMTs who responded to the scene created medical records.  The narrative portion of the medical records indicates that Jamal was tased and drive-stunned an unknown amount of times before EMS arrived.  Thus, Individual Defendants, instead of waiting for medical personnel to arrive, chose to assault Jamal and cause his suffering and death.  That portion of the medical record also contains the sentence, "The patient is known to have seizures."  Thus, this information provided by jail staff shows that they were fully aware that Jamal was known to have seizures.

b      Hospital Records

49.     Jamal was transported to a local hospital after being assaulted and tased.  One of the diagnoses listed in his records was "epilepsy."  A physician listed Jamal's immediate/preliminary cause of death as cardiopulmonary arrest.  Medical records also indicate

that, in connection with removing life support for Jamal, his family chose to donate his body to science and/or for organ donation.

50.     A hospital note indicates, apparently from EMS comments to hospital staff when arriving at the hospital with Jamal, that upon arrival to the jail, Jamal "appeared to be postictal and aggressive."  The medical record also indicates, regarding Jamal's medical history, "documented seizure disorder and atrial fibrillation."   Jamal's toxicology screen was negative for opiates, methadone, barbiturates, phencyclidines, amphetamines, benzodiazepines, cocaine, and cannabinoids.  The medical record also showed that Jamal was a relatively small man, only 5'-8" tall, with a body mass index of 22.9.

<u>c        Autopsy – Harris County Institute of Forensic Sciences</u>

51.     An autopsy of Jamal's body was conducted.  The autopsy report indicated a number of injuries suffered by Jamal.  Upon information and belief, these were caused by Individual Defendants' assault and restraint of Jamal.  Jamal's body evidenced blunt impact injuries to his right arm and an apparent recent abrasion on the right thumb of his left arm.  There was also a subcutaneous hemorrhage on his wrist and distal forearm of his left arm.  There were also abrasions and/or hemorrhages on or to his left leg.  There was a puncture wound in his right leg, measuring a quarter of an inch in diameter, on the skin surface, and it penetrated underlying subcutaneous tissues.  There were blunt impact injuries to Jamal's torso, and a puncture wound in his chest.  The puncture wound, likely caused by a Taser barb, penetrated underlying musculature of the anterior chest and caused soft issue hemorrhage.  There was also a blunt impact injury to Jamal's head.  The toxicology report did not detect any drugs of abuse in Jamal's system.  Thus, upon information and belief, when Jamal was arrested, he was not only not intoxicated by a substance other than alcohol, he was not intoxicated at all.

C.      Individual Defendants' Knowledge and Education

52.     As indicated elsewhere in this complaint, Individual Defendants had sufficient knowledge to know that the force that they used with Jamal, and the failure to obtain medical treatment instead of using force, was brutal, constituted punishment, and thus unreasonable and deliberately indifferent.  Moreover, to the extent Individual Defendants violated any City of Pasadena policies which were appropriate and/or constitutional, such violation is some evidence that such Individual Defendants violated the United States Constitution.

53.     Individual Defendants violated the following City of Pasadena policy:

13.2.6 – USE OF FORCE
Employees are sometimes required to use force in order to subdue or restrain a prisoner. Personnel must realize that along with the authority to use force comes the responsibility to be wise, prudent, and exercise restraint in its application. Employees are authorized to use only the amount of force necessary for the protection of him/herself or others. Those employees involved in the use of force with a prisoner will complete the necessary reports including a "Use of Force" report.

Individual Defendants did not need to use any force, much less assaultive force, including through use of a Taser, to protect either themselves, others, or Jamal.  Jamal was not accused of any serious crime.  He was obviously not fleeing, because he was confined in a jail cell, alone at the time he was assaulted by officers.  Finally, he was not a danger to the officers or others.  The officers themselves caused Jamal's bodily movements, resulting from the seizure and/or postictal state.

54.     Further, Individual Defendants violated, or stood by and failed to intervene while others violated, the City of Pasadena policy regarding use of Tasers.  That policy, at the time Jamal was assaulted by Individual Defendants, read in part:

Members will not use a TASER in any of the following situations:

a)      The subject has been exposed to flammable liquids.
b)      The use would occur in a flammable or explosive environment, e.g., in a clandestine Jab.

c)     The subject is likely to sustain a secondary injury from a fall from TASER use e.g., standing on a rooftop ledge or elevated surface.

d)     The subject is a female person believed to be pregnant.

e)     The subject is handcuffed and/or shackled, unless circumstances pose an immediate threat.

f)     As a tool of coercion of as a means of punishment.

Individual Defendants either violated or stood by and failed to intervene while another Individual Defendant violated sections (c) and (f). Jamal was not only likely to sustain a secondary injury from a fall, while being tased during a seizure. Such injury actually occurred. Moreover, Individual Defendants used a Taser, or stood by while other(s) used a Taser, to coerce and/or punish Jamal.

D.     *Monell* Liability of City of Pasadena

1.     Introduction

55.     Plaintiffs set forth in this section of the pleading additional facts and allegations supporting liability claims against City of Pasadena pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and its progeny. It is Plaintiffs' intent that all facts asserted in this pleading, and not just the facts and allegations set forth in this section, relating to policies, practices, and/or customs of City of Pasadena support such *Monell* liability claims. Such policies, practices, and/or customs alleged in this pleading were moving forces behind and caused the constitutional violations and damages and death referenced herein. Moreover, these policies, practices, and/or customs operated together to cause the constitutional violations and damages and death referenced in this pleading. Further, merely because facts are pled in this portion of the complaint does not mean that those facts are intended only to support *Monell* liability against City of Pasadena, but also, when appropriate, to support claims against Individual Defendants.

56.     City of Pasadena knew when Jamal had a seizure that its personnel, policies, practices, and/or customs were such that it could not or would not meet its constitutional

obligations regarding Jamal.  City of Pasadena made decisions about policy and practice which it implemented through its City Council, Chief of Police, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of City of Pasadena as it related to inmates such as Jamal.  The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege at the pleading stage the specific identity of City of Pasadena's chief policymaker, and Plaintiffs do not do so.  Plaintiffs merely suggest some final policymakers regarding issues in this case and ultimately rely on the Court to make that determination in accordance with Fifth Circuit precedent.

57.    There were policies, practices, and/or customs of City of Pasadena which were moving forces behind, caused, were producing causes of, and/or proximately caused Jamal's suffering and death, and other damages referenced in this pleading.  Pasadena made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when Pasadena implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, and/or death.

### 2.    City of Pasadena Policies, Practices, and/or Customs

58.    Plaintiffs list beneath this heading City of Pasadena policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including Jamal's death.  Thus, City of Pasadena is liable for all such damages.

59.    City of Pasadena's use of force policy, as it related to Jamal's death, was virtually no policy at all and gave little substantive guidance to Individual Defendants.  The use of force policy indicated the general proposition that City of Pasadena police officers should use only the force reasonably necessary to bring an incident under control, while protecting the life of the

officer and others.  It further, provided the nebulous legal statement, "The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances." The policy provides no use-of-force continuum, allowing officers to use various levels of force before moving to deadly force.  Thus, allegations in this paragraph/section, caused,  approximately caused, and/or were producing causes of and/or moving forces behind Jamal's death and other damages referenced in this pleading.

60.     City of Pasadena's policy regarding use of a Taser by Individual Defendants contained no prohibition regarding use of a Taser on a person suffering a seizure.  As shown above, City of Pasadena policy regarding use of a Taser in its jail indicated that a Taser should not be used in six specific situations.  None of those situations addressed a person having a seizure.  This was patently unreasonable and would, and did with regard to Jamal, result in significant harm and/or death.  It was common knowledge to all Defendants that inmates with drug issues will commonly, secondary to such drug issues, suffer seizures.  Moreover, seizure disorders (Epilepsy) are common among society generally, as all Defendants knew.  City of Pasadena's policy allowing the tasing of a person experiencing a seizure, when a seizure is an issue with electrical impulses in the brain, is medieval at best, and torture at worst.

61.     Upon information and belief, no Individual Defendant was reprimanded, demoted, or suffered any adverse employment decision by City of Pasadena as a result of the tasing, assault, and death of Jamal.  This is some evidence of pre-existing policy, practice, and/or custom.  City of Pasadena's failure to take such action with regard to any Individual Defendant was not merely ratification, in the sense that it showed Pasadena's blessing of tactics used when assaulting Jamal, but ratification of the conduct in the sense that such approval indicated pre-existing policy, practice, and/or custom.  In fact, contrary to what Plaintiffs have pled, and thus pleading in the

alternative, Attorney Kristie Lewis, as Police Civilian Director for Pasadena, when reporting to the administrative command assistant chief for Pasadena Police Department, wrote, "[U]pon review of all applicable evidence related to this matter, I find that PSO Supervisor McCain, PSO Marroquin and PSO Whitehead are not in violation of [Pasadena use of force and tactical considerations and limitations] policies and any allegations made against them should be EXONERATED." (Emphasis in original). Even so, Attorney Lewis noted that "training needs [to occur] to prevent a future occurrence of this kind."

62.     This determination, by Attorney Lewis, was not made until September 3, 2020 – long after the incident. Attorney Lewis also indicated her opinion as to the importance of excited delirium training for Individual Defendants. She also noted, in emails between her and Alyssa Sanchez, an administrative assistant in Pasadena Personnel Training, that neither Officer McCain, Officer Marroquin, or Officer Whitehead had received necessary training before dealing with Jamal. It is clear that Pasadena believes that Jamal was suffering excited delirium, and apparently according to Pasadena, leading to Jamal's death. Pasadena clearly had this knowledge before Individual Defendants had to deal with Jamal, but Pasadena chose not to train any of the Individual Defendants regarding excited delirium. Such training, even many months after Jamal's death, had not occurred for PSO Supervisor McCain. PSO Marroquin and PSO Whitehead did not receive such training until July 2019.

**Kristie L. Lewis**

| | |
|---|---|
| **From:** | Alyssa Sanchez |
| **Sent:** | Thursday, August 20, 2020 1:38 PM |
| **To:** | Kristie L. Lewis |
| **Subject:** | Re: Training |

No worries, please see below:

Mc Cain- no record of taking course

Marroquin- 7/2/2019

Whitehead- 7/2/2019

*Excited Delirium*
*Mclain - ☒☒ none*
*Marroquin - 7/2/19*
*Whitehead - 7/2/19*

Best regards,

Alyssa Sanchez
Personnel Training
Administrative Assistant
4801 Spencer Hwy
Pasadena, TX 77505
713.475.4824

---

**From:** Kristie L. Lewis <klewis@pasadenatx.gov>
**Sent:** Thursday, August 20, 2020 1:32 PM
**To:** Alyssa Sanchez <aasanchez@pasadenatx.gov>
**Subject:** RE: Training

Alyssa:

Thanks so much. I just realized I omitted Excited Delirium training. Could you check to see when they all last had this training? Sorry for any inconvenience.

Thanks,
Kristie

**From:** Alyssa Sanchez <aasanchez@pasadenatx.gov>
**Sent:** Thursday, August 20, 2020 1:31 PM
**To:** Kristie L. Lewis <klewis@pasadenatx.gov>
**Subject:** Re: Training

Kristie,

1
Pasadena_21

63.     Further, considering that Individual Defendants used force with Jamal, and alleged that they used force defensively, Pasadena certainly should have trained those employees regarding use of force and defensive tactics.  Those employees should not have been dealing with inmates in the Pasadena jail without such training.  However, Pasadena, as with excited delirium, did not train any of the PSO Defendants in either use of force or defensive tactics, before Jamal was killed, other than one course apparently for PSO Supervisor McCain.

here is that information you requested:

McCain- Use of Force in Corrections 3/25/2009 & no record of defensive tactics

Marroquin- Use of Force Intermediate 9/6/2019 & Defensive Tactics 10/29/2019

Whitehead- there is no record of him taking either course

Best regards,

Alyssa Sanchez
Personnel Training
Administrative Assistant
4801 Spencer Hwy
Pasadena, TX 77505
713.475.4824

*USE OF FORCE,
McCain 3/25/09
Marroquin - 9/6/19
Whitehead - none*

**From:** Kristie L. Lewis <klewis@pasadenatx.gov>
**Sent:** Thursday, August 20, 2020 1:22 PM
**To:** Alyssa Sanchez <aasanchez@pasadenatx.gov>
**Subject:** RE: Training

Sorry. I think it is Defensive Tactics.

**From:** Alyssa Sanchez <aasanchez@pasadenatx.gov>
**Sent:** Thursday, August 20, 2020 11:39 AM
**To:** Kristie L. Lewis <klewis@pasadenatx.gov>
**Subject:** Re: Training

Good morning,

*DEFENSIVE TACTICS
McCain - None
Marroquin - 10/29/19
Whitehead - None*

Do you know what exact handling prisoners training's you are needing dates for?

Best regards,

Alyssa Sanchez
Personnel Training
Administrative Assistant
4801 Spencer Hwy
Pasadena, TX 77505
713.475.4824

**From:** Kristie L. Lewis <klewis@pasadenatx.gov>
**Sent:** Thursday, August 20, 2020 11:17 AM
**To:** Alyssa Sanchez <aasanchez@pasadenatx.gov>
**Subject:** Training

2
Pasadena_22

Plaintiffs' Original Complaint – Page 40 of 59

Thus, PSO Supervisor McCain received use of force training just three days before Individual Defendants assaulted Jamal.  However, Officer Marroquin did not receive use of force training until September 6, 2019, and Officer Whitehead had still not received any use of force training as of August 20, 2020.  As of August 20, 2020, Officer McCain, and Officer Whitehead had not received defensive tactics training.

64.     Moreover, even though Ms. Lewis apparently failed to address Taser training, at least in documents Pasadena decided to release to Plaintiffs, Taser training and certification would be critical for Individual Defendants who dealt with Jamal.  However, upon information and belief, as of March 28, 2019, the time Jamal was assaulted and killed, no Individual Defendant was certified to use a Taser.  Upon information and belief, Officer Aguirre had not received Taser training and/or been certified to use a Taser.  Further, upon information and belief, PSO Supervisor McCain had not received Taser training since April 2014:  PSO Whitehead had not received Taser training since October 2013; and PSO Marroquin had not received Taser training since October 2015.  Upon information and belief, it is a generally-accepted standard, among police departments, that any officers using a Taser should be trained and certified at least yearly.  Thus, City of Pasadena chose to provide in substance no training at all to its officers, in the sense that none of the officers involved in the incident, upon information and belief, had received any recent, appropriate, or timely training or certification regarding how to use a Taser.

65.     City of Pasadena's Handcuffing Prisoners policy, 13.1.1, was also a moving force behind and proximately caused, and was a producing cause, of all damages and death referenced in this pleading.  That policy read in part that "it is strongly advised that in the following circumstances [a] prisoner should be handcuffed:  ". . . a) Conditions causing actions of the prisoner to be unpredictable (degree of intoxication, mental or emotional state). . . . d) The prisoner

attempted to hurt himself/herself or others." Thus, this policy made no provision whatsoever, and completely ignored, a person such as Jamal who was suffering a seizure. Upon information and belief, all Defendants knew that the last thing anyone should do to a person suffering a seizure is to attempt to restrain and/or assault, and/or threaten to assault, such person.

66. Pasadena's Taser use policy was also a moving force behind and cause injuries and damages referenced in this pleading. That policy mandated that Pasadena employees never aim a Taser directly in the eyes or face of any person. However, that policy mentioned nothing at all about not deploying a Taser into a person's chest area. It is well known among those who have been trained how to use a Taser that a Taser should not be used, whether through deployment or drive-stun mode, in or toward a person's chest. Such use can cause severe injury and/or death.

67. Pasadena's policy 13.2.8.1, Use of Oleoresin Capsicum (OC-10) Aerosol Spray, was also a moving force behind and caused all damages referenced in this pleading. That policy required that "Police Service Officers will not utilize OC." That policy allowed police officers to use OC spray, which is a lower use of force on the use of force continuum than a Taser. Thus, Pasadena policy was that PSOs, who were not licensed, trained peace officers, could use Tasers and thus cause severe injury and death, but they could not use OC spray instead. This was patently unreasonable and certain to cause injury and death referenced in this pleading.

68. Pasadena also had a policy of using PSOs to deal with jail inmates, including use-of-force incidents such as that at issue with Jamal. PSOs are not licensed peace officers and thus do not receive the training and competency testing that licensed peace officers should receive. Thus, they are not competent, and were not competent, to deal with issues with which Jamal was suffering. Thus, pleading in the alternative to any contrary allegations in this pleading, to the

extent PSOs did not have sufficient knowledge, education, and/or training as to how to deal with Jamal, it was as a result of Pasadena's failure to assure such knowledge, education, and/or training.

69.     In the alternative to allegations in this pleading that Individual Defendants were aware of how to deal with Jamal, and others in the midst of a seizure, if any Individual Defendant was unaware of same, it was due to a total failure of Pasadena to train such Individual Defendant as to how to deal with prisoners who were in the midst of a seizure.  If Pasadena did train or assure seizure-related training for Individual Defendants, then Individual Defendants knew information contained in the bullet points below.  If, on the other hand, Pasadena did not train or assure such training, then Pasadena's failure to train or assure such training regarding information contained in the bullet points below was a moving force behind and caused damages and death in this pleading.  Upon information and belief, this information is commonly taught by law enforcement–related trainers:

- Officers may encounter a person who is confused or appears possibly to be under the influence of intoxicants, when the person is actually having a seizure.  Such a person may not follow commands or unknowingly become combative.

- Epilepsy is a medical disability, and it leads to situations, during seizures, in which a person has no control.

- Officers in the presence of a person having a seizure must act in a non-threatening and non-confrontational manner.

- Officers in the presence of a person having a seizure need to understand that such a person may involuntarily respond with flailing and/or undirected movements, constituting perceived voluntary physical aggression, but which are instead involuntary movements.  Thus, officers should not view such movements as being threatening or assaultive.

- A person exiting a seizure, and/or in the postictal state, may feel intimidated or frightened by the presence of law enforcement officers.

- A person having a seizure cannot be resisting arrest since the person has no ability to voluntarily control his or her actions.

3.    Other Incidents

70.    Other incidents involving death and/or excessive force used by Pasadena police officers support allegations in this pleading as to City of Pasadena policies, practices, and/or customs being a moving force behind and/or causing all damages referenced in this pleading. Allegations in this portion of the pleading are made upon information and belief.

71.    On or about November 21, 2005, Barney Green was stopped for a traffic violation by Pasadena police Sergeant Norman.  Sergeant Norman opened the driver door of the vehicle and observed Mr. Green take a drink of water as he was chewing.  Sergeant Norman ordered Mr. Green to place his hands on the steering wheel but, after refusing, Sergeant Norman sprayed Mr. Green in the face with pepper spray.  Mr. Green failed to comply with Sergeant Norman's instruction, so Sergeant Norman drive stunned Mr. Green in the shoulder with a Taser.  Sergeant Norman did it once more, and Mr. Green exited the vehicle and laid flat on his stomach.  When Mr. Green was ordered to spit out whatever he was chewing, Sergeant Norman stunned him with his Taser once again.

72.    On or about July 21, 2007, Pedro Gonzalez, Jr. was attempting to conceal himself in the bed of a pickup truck at a closed mechanic shop parking lot.  Officers observed Mr. Gonzalez to have signs and symptoms consistent with being under the influence of drugs and/or alcohol.  An altercation occurred during an attempt to arrest Mr. Gonzalez.  Mr. Gonzalez was ultimately handcuffed and transported to the Pasadena City jail, instead of directly to a hospital.  Only then did officers ultimately summon an ambulance to the jail.  Ambulance personnel allegedly found Mr. Gonzalez's vital signs to be normal, and Mr. Gonzalez allegedly refused transport to the hospital.  He was then confined in a holding cell.  He passed away, and an autopsy revealed that he had eleven (11) rib fractures on eight ribs, one rib fracture being so significant that it pierced

his lung and caused him to bleed internally.  The reporting officer wrote, "It should be noted that due to the deceased age, poor nutrition, and alcoholism, he was more susceptible to broken bones, including ribs."

73.     On or about December 25, 2009, Oscar Hernandez was at a gathering with two of his neighbors outside of a mobile home.  His neighbors got into an argument, and one neighbor produced a firearm.  One or more other neighbors called "911."  The neighbors who had been arguing left the scene, leaving Mr. Hernandez.  Mr. Hernandez was unarmed and remained present to explain to arriving officers what had occurred.  However, upon information and belief, instead of conversing with Mr. Hernandez, Officer M. Martin shot Mr. Hernandez.  Upon information and belief, the shooting was unreasonable and violated the Constitution.  Mr. Hernandez filed suit against City of Pasadena on or about February 26, 2010.  The parties announced to the court, on December 23, 2011, that the parties had reached a settlement regarding those claims.

74.     On or about June 5, 2015, Mark Oswald was arrested for Public Intoxication and transported to the Pasadena City jail.  He was placed into a jail cell.  Several hours later, he was "released from custody" and transported via ambulance to a hospital.  Upon information and belief, the reason that Mr. Oswald was released from custody was that the City of Pasadena did not want to be forced to pay for his medical expenses.  Mr. Oswald's condition did not improve at the hospital, so he was airlifted to a different hospital.  He passed away on or about June 9, 2015.

75.     On November 21, 2018, in the City of Pasadena, Nathan Schenk drove a vehicle past a stop sign without stopping.  Officer Rigoberto Saldivar, in a Pasadena police patrol vehicle, pulled Nathan over.  Nathan exited the vehicle and ran.  Officer Saldivar chased Nathan, shooting his Taser at Nathan twice without any prior warning.  Officer Saldivar jumped on Nathan after the second Taser deployment in an attempt to subdue Nathan.  Officer Saldivar said to Nathan,

"Mother f****r!." Nathan said, "Don't hit me man. Don't hit me.  Don't hit me."  Officer Saldivar again called Nathan a "mother f****r" while attempting to restrain him on the ground.

76.     Nathan struggled to get away from Officer Saldivar so that he could continue to run away.  Nathan did not strike Officer Saldivar, threaten Officer Saldivar, display a weapon, or threaten any other person.  Nathan's sole goal was to get away from Officer Saldivar after being pulled over.

77.     Officer Saldivar then, without any warning, shot Nathan twice in Nathan's lower back and then once in Nathan's upper chest near his arm pit.  Officer Saldivar did so even though Nathan had extracted himself from Officer Saldivar and was attempting to flee yet again.  Nathan was not suspected of a serious crime, was not threatening anyone or displaying any weapon, and was not a threat to Officer Saldivar's safety or to the safety of any other person in the area.  Nathan simply wanted to get away, and Officer Saldivar shot and killed him.

78.     While Nathan was lying on the ground, dying, Officer Saldivar once again called him a "mother f****r" and a "son of a bitch."  He also said, "Don't you f******g move!  I'll shoot you again!."  He also said, "Don't you damn move!  Don't you f*****g move!"  As Nathan was dying, Nathan said in substance, "I don't have a weapon.  I don't have a gun.  I don't have a weapon."

79.     Upon information and belief, Officer Saldivar was not terminated and/or was not the subject of any adverse employment action as a result of Jamal's death and/or events leading up to it.  This is some evidence of pre-existing policy, practice, and/or custom of using excessive force.  In fact, just a few months after Nathan's shooting death, effective April 22, 2019, Officer Saldivar received a raise.  That raise was signed off and approved by Officer Saldivar's department head, Pasadena's human resources department, Pasadena's budget department, and Mayor

Wagner.  Officer Saldivar's Performance Evaluation Report, signed by him on January 10, 2019, in which Officer Saldivar was rated by Sergeant Lebedzinsk, indicated that Officer Saldivar met expectations in eleven separate rating categories, and exceeded expectations in one category – Law Enforcement/Department Knowledge.  The division commander, bureau commander, and Chief of Police all signed off on the evaluation.  The evaluation covered a rating period of July 1, 2018 through December 31, 2018, thus covering the time period when Officer Saldivar shot and killed Jamal.

80.     As a goal, Officer Saldivar was instructed to "continue to maintain his level of professionalism."  Moreover, as opposed to there being any concern at all in the evaluation related to Nathan's death, Officer Saldivar was instead commended for filing three "County Level charges" since mid-April 2018.  While the word "ratification" is often used with factual allegations such as those in this paragraph/section, what constituted the moving force behind damages and death referenced in this pleading was actually pre-existing policy, practice, and/or custom.  City of Pasadena's decision not to terminate or otherwise discipline Officer Saldivar as a result of Nathan's death evidenced unconstitutional pre-existing policy, practice, and/or custom.

III.     Causes of Action

   A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

81.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.  *Id.* at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable."  *Id.*  (emphasis in original).  The Court concluded that the objectively

unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard.

82.     Since pretrial detainees' rights to receive reasonable medical care and be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights. Thus, in the alternative to any assertion by Plaintiffs in this pleading that claims based on such rights against Defendants should be judged on a "deliberate indifference" standard, the court should not apply that standard to those claims but instead "objective unreasonableness" as applied to use of force claims.

  B.     Remedies and Damages for Violation of Constitutional Rights and/or Other Federal Claims

83.     The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs individually, and for and on behalf of Cliff Benjamin Mitchell and Claimant Heirs, seek, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival

statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If Jamal had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

> C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

84.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiffs individually, Cliff Benjamin Mitchell, and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Jamal's rights guaranteed by the United States Constitution, including the 4th and/or 14th Amendment.  Individual Defendants used unreasonable, excessive, and unconstitutional force, failed to provide reasonable medical care, and failed to protect (and in fact instead punished Jamal), as well as unconstitutionally seized and killed Jamal.  Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading. Individual Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident. Individual Defendants' actions caused, were proximate causes of, and were producing causes of all injuries, damages, and death referenced in this pleading.  Individual Defendants are not entitled to qualified immunity.[2]

---

[2]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state

85.     Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander officer (1) knows that a fellow officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements.  All Individual Defendants, regardless of their rank or position, had constitutional duties related to Jamal's incarceration, suffering, and/or death.  They

---

actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote.  This would be their burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting).  Additionally, qualified immunity violates the Separation Powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

violated those duties and are therefore also liable to Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs pursuant to this theory.

86.     Therefore, Jamal's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- Jamal's conscious physical pain, suffering, and mental anguish;

- Jamal's medical expenses;

- Jamal's funeral expenses; and

- exemplary/punitive damages.

87.     Plaintiffs also individually seek and are entitled to all remedies and damages available to them and others mentioned in this complaint for 42 U.S.C. § 1983 claims for violation of constitutional rights.  Donna Thomas seeks such damages as a result of the wrongful death of her son; Cliff Benjamin Mitchell seeks such damages as a result of the wrongful death of his son; Iliana Claire Hejlik seeks such damages as a result of the wrongful death of her husband; J.S. #1 seeks such damages as a result of the wrongful death of her father; J.S. #2 seeks such damages as a result of the wrongful death of her father; and/or J.S. #3 seek such damages as a result of the wrongful death of her father.  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their  actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by Plaintiffs, Cliff Benjamin Mitchell, J.S. #1, J.S. #2, and J.S. #3 individually, for which they individually seek compensation:

- loss of services that they would have received from Jamal;

- expenses for Jamal's funeral;

- past mental anguish and emotional distress suffered by them resulting from and caused by Jamal's death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Jamal's death;

- loss of companionship and society that Donna Thomas, Cliff Benjamin Mitchell, J.S. #1, J.S. #2, and J.S. #3 would have received from Jamal;

- loss of companionship and society, and consortium, that Iliana Claire Hejlik would have received from Jamal; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jamal's constitutional rights.  Individual Defendants' actions showed a reckless or callous disregard of, or indifference to, Jamal's rights and safety.  Moreover, Plaintiffs individually, and Shamarian Austin also on behalf of Claimant Heirs, and Cliff Benjamin Mitchell, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

    D.    <u>Cause of Action Against City of Pasadena Under 42 U.S.C. § 1983 for Violation of Constitutional Rights</u>

88.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Pasadena is liable to Plaintiffs individually, Cliff Benjamin Mitchell, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Jamal's rights guaranteed by the United States Constitution, including the 4th and/or 14th Amendments.

89.    City of Pasadena acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times.  City of Pasadena's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were

proximate causes of Jamal's suffering, damages, and death, and damages suffered by Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs.

90.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the City of Pasadena Chief of Police was the relevant chief policymaker over matters at issue in this case.  Nevertheless, this is just a suggestion as to the relevant chief policymaker.  The court will determine the appropriate chief policymaker at the appropriate time.

91.    City of Pasadena was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  It also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Jamal's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  City of Pasadena's policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Jamal.

92.    Therefore, Jamal's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from City of Pasadena:

- Jamal's conscious physical pain, suffering, and mental anguish;

- Jamal's medical expenses; and

- Jamal's funeral expenses.

93.    Plaintiffs also individually seek and are entitled to all remedies and damages available to them for 42 U.S.C. § 1983 claims for violation of constitutional rights.  Donna Thomas seeks such damages as a result of the wrongful death of her son; Cliff Benjamin Mitchell seeks such damages as a result of the wrongful death of his son; Iliana Claire Hejlik seeks such damages

as a result of the wrongful death of her husband; J.S. #1 seeks such damages as a result of the

wrongful death of her father; J.S. #2 seeks such damages as a result of the wrongful death of her

father; and/or J.S. #3 seek such damages as a result of the wrongful death of her father.  City of

Pasadena's policies, practices, and/or customs caused, were proximate and/or producing causes of,

and/or were moving forces behind and caused the following damages suffered by Plaintiffs, Cliff

Benjamin Mitchell, and Claimant Heirs, for which they individually seek compensation:

- loss of services that they would have received from Jamal;

- expenses for Jamal's funeral;

- past mental anguish and emotional distress suffered by them resulting from and
  caused by Jamal's death;

- future mental anguish and emotional distress suffered by them resulting from
  and caused by Jamal's death;

- loss of companionship and society Donna Thomas, Cliff Benjamin Mitchell,
  J.S. #1, J.S. #2, and J.S. #3 would have received from Jamal; and

- loss of companionship in society, and consortium, that Iliana Claire Hejlik
  would have received from Jamal.

Moreover, Plaintiffs individually, and Shamarian Austin on behalf of Claimant Heirs, and Cliff

Benjamin Mitchell, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C.

§§ 1983 and 1988.

> E.    Cause of Action Against City of Pasadena For Violation of Americans With
>        Disabilities Act and Rehabilitation Act

94.     In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, City of Pasadena is liable to

Plaintiffs, Cliff Benjamin Mitchell, and/or Claimant Heirs pursuant to the ADA and RA.  Upon information and belief, City of Pasadena has been and is a recipient of federal funds.  Therefore, it is covered by the mandate of the RA.  The RA requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose.  Further, Title II of the ADA applies to City of Pasadena and has the same mandate as the Rehabilitation Act.  Claims under both the RA and ADA are analyzed similarly.

95.     The Pasadena jail is a "facility" for purposes of both the RA and ADA, and the jail's operation comprises a program and services for RA and ADA purposes.  Jamal was a qualified individual for purposes of the RA and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities.  Jamal had a serious seizure disorder, which required medication as indicated in this complaint, Jamal was found at numerous times, arrested for public intoxication, but, upon information and belief, which some or in the alternative most of which were actually events in which he had suffered or was suffering a seizure and may have been in the postictal state.  This not only affected Jamal's ability to deal with life generally, but it, as referenced herein, resulted in numerous arrests and incarceration.  Jamal also had mental health issues, as evidenced by City of Pasadena documents. Jamal was therefore disabled.

96.     Jamal was also discriminated against by reason of his disability.  Individual Defendants restrained, assaulted, tased, and killed Jamal as a result of him having a seizure.  There is no rational explanation, other than discriminating against Jamal based on his seizure disorder, for actions Defendants took against a man in the midst of a seizer and/or the postictal state. Jamal

did not receive medical care but instead was assaulted and killed as a result of his epilepsy – seizure disorder.

97.     A majority of circuits has held, for Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has thus far declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

98.     City of Pasadena's failure and refusal to accommodate Jamal's mental and/or medical disabilities while in custody violated the RA and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Jamal's suffering and death and Plaintiffs', Cliff Benjamin Mitchell's, and/or Claimant Heirs' damages.  City of Pasadena's violations of the RA and the ADA included the failure to reasonably modify facilities, services, accommodations, and/or programs to reasonably accommodate Jamal's disabilities.  Jamal was treated as a person who was volitionally resisting arrest, when that clearly was not true.  Thus City of Pasadena chose to use force with Jamal as it would, upon information and belief, with others who were not suffering from a seizure disorder.  These failures and refusals, which were intentional, proximately caused Jamal's damages and death, and Plaintiffs', Cliff Benjamin Mitchell's, and Claimant Heirs' damages.  Because Jamal's death resulted from City of Pasadena's intentional discrimination against him, Plaintiffs, Cliff Benjamin Mitchell, and/or Claimant Heirs are entitled to the maximum amount of compensatory damages allowed by law.  Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Plaintiffs', Cliff

Benjamin Mitchell's, and Claimant Heirs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and/or the ADA, and Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.     Concluding Allegations and Prayer

       A.     Conditions Precedent

99.     All conditions precedent to assertion of all claims herein have occurred.

       B.     Use of Documents at Trial or Pretrial Proceedings

100.     Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

       C.     Jury Demand

101.     Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

       D.     Prayer

102.     For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs (Shamarian Austin and Donna Thomas), Cliff Benjamin Mitchell, and Claimant Heirs (Iliana Claire Hejlik, J.S. #1, J.S. #2, and J.S. #3) have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

    a)     actual damages of and for Shamarian Austin, as administrator of the referenced estate, and for Donna Thomas, Cliff Benjamin Mitchell, Iliana Claire Hejlik, J.S. #1, J.S. #2, and J.S. #3 individually, including but not necessarily limited to:

- loss of services that they would have received from Jamal;

- medical expenses for Jamal;

- expenses for Jamal's funeral;

- their past mental anguish and emotional distress resulting from and caused by Jamal's death;

- their future mental anguish and emotional distress resulting from and caused by Jamal's death;

- Jamal's conscious physical pain, suffering, and mental anguish;

- Donna Thomas, Cliff Benjamin Mitchell, Iliana Claire Hejlik, J.S. #1, J.S. #2, and J.S. #3 loss of companionship and society they would have received from Jamal; and

- Iliana Claire Hejlik's loss of consortium;

b) exemplary/punitive damages for Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs from Individual Defendants;

c) reasonable and necessary attorneys' fees for Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

d) court costs and all other recoverable costs;

e) prejudgment and postjudgment interest at the highest allowable rates; and

f) all other relief, legal and equitable, general and special, to which Plaintiffs, Cliff Benjamin Mitchell, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


     /s/ T. Dean Malone
     T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
Kristen Leigh Homyk
Texas State Bar No. 24032433
Southern District of Texas Bar No. 3513488
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:          (214) 670-9904


Attorneys for Plaintiffs