United States District Court
Southern District of Texas
**ENTERED**
June 07, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHAMARIAN AUSTIN, *dependent administrator of the estate of Jamal Ali Shaw, deceased, et al.*, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. H-21-774 |
| CITY OF PASADENA, TEXAS, *et al.*, | § § § | |
| Defendants. | § § | |

## ORDER

Pending before the Court are Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Expert Kevin Stuart (Document No. 66) and Defendants' Motion for Final Summary Judgment (Document No. 68). Having considered the motions, submissions, and applicable law, the Court determines Plaintiffs' motion should be denied as moot and Defendants' motion should be granted.

## I. BACKGROUND

This is a case involving alleged constitutional violations committed by police when a man suffered an epileptic seizure while in police custody. On March 28, 2019, thirty-two year-old Decedent Jamal Shaw ("Shaw") was arrested by Pasadena Police Department Officer L. Arguetta on suspicion of public intoxication. Shaw was transported and booked into the Defendant City of Pasadena (the "City") jail.

While in a jail cell, Shaw began having an epileptic seizure. Plaintiffs allege jail authorities had knowledge of Shaw's epilepsy, mental health, and substance issues at the time. Other detainees in the jail told jail authorities Shaw had epilepsy and was having a seizure. Defendants Police Service Officers Johanna Marroquin ("Marroquin"), Ryan Whitehead ("Whitehead"), and Darlene McCain ("McCain") (collectively, the "PSO Defendants") saw Shaw seizing and allegedly entered his cell and assaulted him, including repeatedly tasing him. Defendant Officer Martin Aguirre ("Aguirre") then allegedly entered the cell and restrained Shaw before turning him over to the care of emergency medical services technicians ("EMTs"). Shortly after leaving the jail and arriving at the hospital, Shaw died and a physician noted his cause of death as cardiopulmonary arrest.

On March 9, 2021, various parties associated with Shaw filed this suit. On May 4, 2021, Plaintiffs amended their complaint. On November 5, 2021, the Court granted in part and denied in part Defendants' motion to dismiss. On December 30, 2021, Plaintiffs moved to exclude certain opinions of Defendants' expert Kevin Stuart. On January 3, 2022, Defendants moved for summary judgment on all remaining claims. The remaining claims are: (1) Fourteenth Amendment claims brought under 42 U.S.C. § 1983 for excessive force, the right to reasonable medical care, and the right to be protected from harm against the PSO Defendants; (2) bystander liability for the same Fourteenth Amendment claims discussed above

against the PSO Defendants and Aguirre (collectively, the "Indivdiual Defendants");

(3) constitutional violations against the City pursuant to *Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658 (1978); and (4) violations of Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12132 (the "ADA") and Section 504 of the

Rehabilitation Act (the "Rehab Act") against the City.

## II. STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any

material fact and the movant is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(a). The Court views the evidence in a light most favorable to the

nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

Initially, the movant must present the basis for the motion and the elements of the

causes of action upon which the nonmovant is unable to establish a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then

shifts to the nonmovant to identify specific facts demonstrating a genuine issue for

trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586–87 (1986). A dispute of "material fact is 'genuine' if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."

*Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

But the nonmovant's bare allegations, standing alone, are insufficient to

defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247–48 (1986). The nonmovant cannot rest on his allegations to get to a jury without any significant probative evidence tending to support those allegations. *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir. 1994). If a reasonable jury could not return a verdict for the nonmovant, then summary judgment is appropriate. *Liberty Lobby, Inc.*, 477 U.S. at 248. It is not the function of the Court to search the record on the nonmovant's behalf. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992). Therefore, while the Court views "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant, the nonmoving party . . . must respond by setting forth specific facts indicating a genuine issue for trial." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000) (quoting *Rushing v. Kan. City S. R.R. Co.*, 185 F.3d 496, 505 (5th Cir. 1999)).

### III. LAW & ANALYSIS

The Court begins by reciting the sequence of events in the jail as shown by the recordings submitted by the parties. The Court then addresses the liability of the Individual Defendants, before moving to City's liability for the constitutional violations and then the ADA and Rehab Act violations.

*A.    Sequence of Events in Video Evidence*

The video from the jail in which Shaw was held (the "Jail Video") shows Shaw fall to the floor of a holding cell identified as Cell H and begin seizing around

6:15 on the morning of March 28, 2019.[1] The other detainees in the cell alert the PSOs, and Marroquin and Whitehead respond by transferring the other detainees to another cell at 6:16:57. Around 6:16, Marroquin makes a call on the police radio requesting emergency medical services.[2] At 6:17:16, Marroquin and Whitehead enter the cell, where they stand over Shaw's convulsing body. At 6:18:11, Marroquin and Whitehead approach Shaw and place their hands on his body near his shoulders and upper back. It is unclear from the Jail Video what they are trying to do, but Defendants' motion represents they were trying to keep Shaw away from the wall and Plaintiffs' response states they are trying to "restrain him and turn him prone."[3] Shaw then rolls onto his back and begins rolling around and kicking his feet. Marroquin and Whitehead keep their hands on Shaw, at times apparently moving him away from the wall and at other times apparently restraining his arms and legs,

---

[1] *Defendants' Motion for Final Summary Judgment*, Document No. 68, Exhibit 9 (*Video Recording from the Pasadena Lock-Up*).

[2] *Plaintiffs' Response to Defendants' Motion for Final Summary Judgment*, Document No. 80 at 7.

[3] *Defendants' Motion for Final Summary Judgment*, Document No. 68 at 12; *Plaintiffs' Response to Defendants' Motion for Final Summary Judgment*, Document No. 80 at 8.

while Shaw continues to move around and kick.[4] At times it is unclear from the video what the PSOs are attempting to do.

At 6:21:29, Whitehead apparently attempts to pin Shaw and straddles Shaw's torso in an unsuccessful attempt to regain control. At 6:21:51, Marroquin readies her Taser in drive-stun mode for pain compliance. At 6:21:54, Marroquin begins attempting to tase Shaw, although she struggles because of Shaw's body movement. At 6:22:07, Marroquin holds Shaw's leg down and begins tasing him for a few seconds. At this point, Shaw begins kicking more violently, directly at Marroquin. Marroquin steps away, then resumes attempting to tase Shaw. At 6:22:34, Whitehead loses contact with Shaw, who then rolls away. At 6:22:37, Shaw gets up and begins walking away from Whitehead and Marroquin and towards the toilet area of the cell. McCain enters the cell at 6:22:48. After leaning against the back wall for a few seconds, at 6:22:52 Shaw turns around and begins walking towards Whitehead and Marroquin.

At this point, Whitehead raises his Taser and tases Shaw, who stumbles and falls forward. McCain and Marroquin back up while Shaw thrashes on the floor and Whitehead continues tasing. McCain grabs at Shaw, apparently attempting to drag

---

[4] The Court notes it is unclear from the evidence when exactly Shaw's seizure ends and when his postictal state begins, whether Shaw is in fact experiencing a series of seizures, and the extent of his consciousness at different points in the video.

him away from the wall, while Whitehead continues tasing him. McCain and Marroquin attempt to restrain Shaw, who continues to resist. All three PSOs attempt to restrain Shaw as he rolls off camera. Both parties represent the ambulance arrives somewhere around this time. At 6:24:14, Whitehead gets up and again points his Taser at Shaw. At 6:24:40, Aguirre enters the cell and succeeds in handcuffing Shaw at 6:26:30. The EMTs are denied entry to the cell while Aguirre struggles to handcuff Shaw. The Individual Defendants hold Shaw down, and at 6:27:27 Marroquin leaves the cell to retrieve a restraint chair.

At 6:27:38, Whitehead and Aguirre grab Shaw by the shoulders and stand him up and attempt to walk him to the door, and Shaw falls. At 6:28:00, Shaw is strapped to a restraint chair rather than a gurney. At 6:28:07, Shaw continues to resist while he is strapped in and Marroquin holds him back.[5] At 6:29:18, the Individual Defendants have completed strapping Shaw into the restraint chair, and he is wheeled off to the booking area for evaluation by the EMTs. Defendants represent that, at this time, Shaw is administered injections to calm his behavior. At 6:45:50, Shaw is moved to a gurney and rehandcuffed. At 6:57:40, as the ambulance begins to leave the jail, Shaw suffers cardiac arrest. Although he was temporarily revived,

---

[5] Although this video is part of the same exhibit as the cell footage, this video is from a camera located in the jail hallway.

he did not recover and died the next day. It is undisputed his cause of death is cardiopulmonary arrest.

B.     *Liability of the Individual Defendants as to Constitutional Violations*

The Court addresses the claims of excessive force, denial of medical care, and right to be protected from harm in turn.

1.     *Excessive Force*

The PSO Defendants contend they are entitled to summary judgment on the grounds of excessive force because they used reasonable force given the circumstances, and further that they are entitled to qualified immunity on this claim. Plaintiffs contend qualified immunity is not available because any reasonable officer would have realized their conduct restraining and tasing Shaw was excessive force.

Qualified immunity is "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity protects government officials performing discretionary functions from [civil] liability 'unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001) (quoting *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995)). "Once an official pleads the defense, . . . [t]he plaintiff bears the burden of negating the qualified immunity, but all inferences are drawn in [their] favor." *Brown v.*

*Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Id.* At summary judgment, the plaintiff cannot rest on unsworn allegations in the pleadings and must instead produce evidence to negate qualified immunity. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very act in question has been previously been held unlawful, . . . but it is to say that in light of pre-existing law the unlawfulness must have been apparent." *Id.* (citations omitted). When "any reasonable officer should have realized" their actions offend the Constitution, that constitutional right is considered clearly established. *See Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020). To defeat qualified immunity, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 106 (1986)).

Plaintiffs identify no case law on point establishing Marroquin, Whitehead, and McCain's actions as unconstitutional. Rather, Plaintiffs contend the force used to subdue Shaw was so grossly disproportionate to the force necessary that any reasonable officer should have realized their actions violated Shaw's rights.

Here, the Marroquin and Whitehead responded to Shaw's seizure by entering the cell and observing Shaw, before calling for an ambulance through the radio. Marroquin represents she and Whitehead then attempted to move Shaw away from the wall, in accordance with their training, so that Shaw would not injure himself.[6] The Jail Video shows they attempted to restrain Shaw in earnest once he began kicking at them, and allegedly trying to bite them as well.[7] Marroquin and Whitehead only drew their Tasers after several minutes, when their attempts to regain control of Shaw had been ineffective and he had grown increasingly resistant. Marroquin and Whitehead tase Shaw throughout the encounter because they did not have control over him and he had not stopped resisting. Once Shaw rolled away and stood up, Whitehead only tased Shaw once he began walking towards Whitehead and Marroquin. The PSO Defendants represent that they gave Shaw multiple verbal

---

[6] *Defendants' Motion for Final Summary Judgment*, Document No. 68, Exhibit 3 at 4 (*Officer Joanna Marroquin's Declaration*) [hereinafter *Marroquin's Declaration*].

[7] *Marroquin's Declaration, supra* note 6 at 4.

commands during the encounter, which he did not comply with.[8] McCain does not appear to use a Taser at any point in the video. Although the PSO Defendants repeatedly tase Shaw, they do so only when Shaw is out of their control. Plaintiffs do not represent Shaw was tased after Defendants had control over Shaw and he was handcuffed. Plaintiffs do not allege Defendants struck Shaw. From both declarations of Defendants and the Jail Video, Shaw does not stop resisting until he was administered injections by the EMTs. The Court acknowledges during the event in the cell, Shaw is experiencing a seizure and subsequently is in a disoriented postictal state, perhaps lashing-out out of fear, anxiety, confusion, and agitation. However, the Court finds Plaintiffs have failed to show the force utilized by the Individual Defendants was so grossly disproportionate to the force necessary that any reasonable officer should have realized their actions violated Shaw's rights. Accordingly, the Court finds Plaintiffs have failed to make the showing necessary to overcome the Individual Defendants' qualified immunity as to the excessive force claim. Summary judgment is thus granted as to the excessive force claims.

---

[8] *See Defendants' Motion for Final Summary Judgment*, Document No. 68, Exhibit 1 at 3 (*Police Officer Martin Aguirre's Declaration*) [hereinafter *Aguirre's Declaration*]; *Marroquin's Declaration, supra* note 6 at 4; *Defendants' Motion for Final Summary Judgment*, Document No. 68, Exhibit 4 at 4 (*Officer Ryan Whitehead's Declaration*).

### 2.    *Right to Reasonable Medical Care*

Plaintiffs contend Defendants violated Shaw's right to reasonable medical care by continuing to restrain Shaw after he was handcuffed instead of immediately turning him over to the EMTs and by placing him in a restraint chair instead of a gurney. Defendants contend they did not violate Shaw's right to medical care because they called for an ambulance as soon as they realized he was having a seizure and restrained Shaw to the degree necessary to provide the EMTs a safe environment to provide necessary care.

In the context of medical care, a prison official violates a detainee's constitutional rights when they act with deliberate indifference to a prisoner's serious medical needs. *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 754 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). Deliberate indifference is an extremely high standard to meet but can be satisfied by a "wanton disregard for an inmate's serious medical needs." *Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2021) (cleaned up). This includes "intentionally denying or delaying" access to medical care. *Estelle*, 429 U.S. at 104–05.

It is undisputed Marroquin called for an ambulance as soon as she and Whitehead realized Shaw was experiencing a serious medical episode. Defendants contend the first time they put hands on Shaw was to move him away from the wall while experiencing his seizure, in accordance with their training. Shaw was

handcuffed at 6:26:30, and then continued to struggle. Whitehead and Aguirre stood Shaw up and walked him to the restraint chair at 6:27:38, a little over a minute after he was successfully handcuffed. On walking to the restraint chair and while being strapped in, Shaw continued to struggle, at one point apparently attempting to headbutt one of the Defendants. Defendants present evidence Shaw was placed in the restraint chair rather than the gurney initially because they wanted to ensure the safety of both Shaw and the EMTs while Shaw was examined.[9] It is undisputed Shaw was transferred to the gurney after he was given two doses of a sedative and calmed down enough to be transferred, although he was still restrained.[10] Although the response of the Defendants was not that of trained medical professionals, their response of immediately calling an ambulance and attempting to restrain Shaw before putting him in the gurney was appropriate in light of his continued resistance and Defendants' concern for the safety of Shaw, themselves, and the EMTs. The Court finds Defendants did not show deliberate indifference and thus summary judgment is granted as to the denial of reasonable medical care claim.

---

[9] *Aguirre's Declaration, supra* note 8 at 4.

[10] Evidence indicates Shaw was given a drug called "Verset" to calm him down. *Plaintiffs' Response to Defendants' Motion for Final Summary Judgment*, Document No. 80, Exhibit F at 5 (*Pasadena Police Department Case Supplement*). For the purposes of this motion, the Court presumes this is a misspelling of Versed, the brand name of the common injectable sedative midazolam.

### 3.    Right to Be Protected from Harm

The claim of the right to be protected from harm is not specifically briefed by either party in the motion for summary judgment or the response. Because this is a constitutional claim lodged against the Individual Defendants, they are protected by qualified immunity. Because Plaintiffs do not produce case law sufficiently similar to show the Individual Defendants should have been on notice they were violating Shaw's rights, or evidence showing Individual Defendants otherwise should have reasonably known they were violating Shaw's rights, the Court finds the Individual Defendants are entitled to qualified immunity as to this claim. Accordingly, summary judgment is granted as to the right to be protected from harm claim.

### C.    Liability of the City as to the Constitutional Claims

Plaintiffs contend the City's use of force policies are so general and vague as to have no meaning at all, and thus constitute a policy, custom, or practice of tolerating and encouraging excessive force. The City contends Shaw was not denied any right and that there's no evidence of an unconstitutional policy promulgated or adopted by the City's policymaker.

"[M]unicipal liability under [§] 1983 requires proof of three elements: a policymaker; and official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694

(1978)). The requirement to show that the policy or custom is the "moving force" behind the alleged violation must not be diluted, lest municipal liability collapse into respondeat superior liability. *Id.* at 580. "When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude it represents official policy." *Sanches v. Young Cnty.*, 956 F.3d 785, 793 (5th Cir. 2020).

Here, the purportedly unconstitutional policy or custom is the use of a Taser on Shaw while he was having a seizure and firing the Taser into Shaw's chest. Plaintiffs do not contest that the City does indeed have a use-of-force policy which requires "officer[s] . . . only use that force which a reasonably prudent officer would use under the same or similar circumstances."[11] Plaintiffs contend the City should have a written policy discussing a use-of-force continuum, but produce no case law to support this proposition. Although the policy may be vague, it is not so vague that it could be considered the "moving force" behind any alleged constitutional violation which took place on the morning of March 28, 2019. Further, the Individual Defendants followed this policy, removing the other detainees from the cell, coming into the cell to move Shaw away from the wall in accordance with their training, starting to attempt to restrain him when he began kicking and biting at the jailers,

---

[11] *Plaintiffs' Response to Defendants' Motion for Final Summary Judgment*, Document No. 80 at 22.

and eventually escalating to the use of a Taser in drive-stun mode in an effort to achieve pain compliance. The Individual Defendants immediately called for an ambulance, and got Shaw to the restraint chair less than two minutes after restraining and cuffing him before moving him to a gurney once he was sedated. The Court thus finds Plaintiffs have failed to show an essential element of municipal liability for a constitutional violation. Summary judgment is accordingly granted as to the *Monell* claim.

D.   *Liability of the City as to ADA and Rehab Act Claims*

Under the ADA and Rehab Act, a plaintiff must adduce evidence demonstrating: (1) the individual was a qualified individual under the ADA; (2) the individual was denied or otherwise discriminated against; and (3) denial of such benefits or discrimination is by reason of his disability. *Windham v. Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017). To recover compensatory damages for violations, a plaintiff must show the discrimination was intentional, not merely deliberate indifference. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 576 (5th Cir. 2002). Plaintiffs contend the Individual Defendants intentionally discriminated against Shaw by restraining and tasing him. Plaintiffs produce no evidence this treatment was intentional. The evidence reflects that the Individual Defendants' handling of Shaw's epileptic seizure and subsequent postictal state arose from their desire to "establish physical control over Shaw" in order "to achieve a safe environment for

16

emergency medical personnel to provide necessary care," not out of intentional discrimination against Shaw as an individual with epilepsy.[12] Accordingly, summary judgment is granted as to the ADA and Rehab Act claims.[13]

### IV. CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Defendants' Motion for Final Summary Judgment (Document No. 68) is **GRANTED**. The Court further

**ORDERS** that Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Expert Kevin Stuart (Document No. 66) is **DENIED AS MOOT**.

The Court will issue a separate final judgment.

SIGNED at Houston, Texas, on this _6_ day of June, 2022.

_____
DAVID HITTNER
United States District Judge

---

[12] *Marroquin's Declaration, supra* note 6 at 4–5.

[13] Because the Court resolves the case by granting the motion for summary judgment, it need not rule on the motion to exclude. Accordingly, the motion to exclude is denied as moot.